Filed 5/3/18; Opinion following rehearing

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE, | C072881 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF120516) |
| v. | |
| BRADY DEE DOUGLAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Yolo County, Paul K. Richardson, Judge.  Reversed.

Kieran D. C. Manjarrez, under appointment by the Court of Appeal, for Defendant and Appellant.

Durie Tangri, Sonali D. Maitra, for Amici Curiae Equality California, Lambda Legal, and the National Center for Lesbian Rights, on behalf of Defendant and Appellant.

Albert J. Menaster, for Amicus Curiae Los Angeles County Public Defender's Office, on behalf of Defendant and Appellant.

Xavier Becerra, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

1

This case is about fairness and equality in our criminal justice system. When a party exercises a peremptory challenge against a prospective juror for an invidious reason, the fact that the party may also have had one or more legitimate reasons for challenging that juror does not eliminate the taint to the process. We reject the application in these circumstances of the so-called "mixed motive" or "dual motive" analysis, which arose in employment discrimination cases as a way for defendant-employers to show that they would have taken an adverse action against a plaintiff-employee whether or not an impermissible factor also animated the employment decision. We hold it is not appropriate to use that test when considering the remedy for invidious discrimination in jury selection, which should be free of *any* bias.

## INTRODUCTION

After defendant Brady Dee Douglas's former boyfriend, a male prostitute, told him victim Jeffrey B. had shorted him money following a prearranged sexual encounter, defendant and codefendant Clifton Damarcus Sharpe tracked down Jeffrey and demanded payment. During a high-speed freeway chase, defendant pointed a gun at Jeffrey and shot at his car several times.

A jury found defendant guilty of attempted second degree robbery, assault with a semiautomatic firearm, shooting at an occupied vehicle, exhibiting a firearm against a person in a vehicle, and carrying a loaded firearm with intent to commit a felony, and found true certain firearm enhancements. (Pen. Code, §§ 664/211, 245, subd. (b), 246, 417.3, 12022, subd. (a)(1), 12022.5, subd. (a); former § 12023, subd. (a).) The trial court sentenced defendant to prison for six years.[1]

On appeal, defendant contends the trial court erred in denying his *Batson/Wheeler* motion after the prosecutor peremptorily excused the only two openly gay prospective

---

[1] We previously dismissed codefendant Sharpe's separate appeal for failure to file a brief. (*People v. Sharpe* (Feb. 7, 2013; C071639) [order of dismissal].)

jurors. (See *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69] (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).) He also argues the trial court erroneously instructed the jury with CALCRIM No. 460, the pattern jury instruction for attempt, which he asserts is unconstitutionally vague and impermissibly creates a mandatory presumption of intent.

We initially rejected defendant's instructional challenge, but found the trial court did not properly evaluate defendant's *Batson/Wheeler* motion. We ordered a remand for the trial court to apply a mixed-motive analysis to the prosecutor's proffered reasons to determine whether those veniremen would have been challenged regardless of their sexuality. We then granted defendant's rehearing petition and obtained supplemental briefing by the parties and by amici curiae.[2]

We now reverse for a new trial before a jury uninfected by discrimination. In light of this holding, we need not address defendant's instructional challenge again.

## BACKGROUND

An information jointly charged defendant and Sharpe with various counts.

During jury selection, the prosecutor and defense attorneys asked the prospective jurors questions about their feelings or perceptions about homosexuality. No one on the venire responded that she or he would have a problem deciding the case based on the facts. Two veniremen, J. and L., were openly homosexual and lived with their partners.

J. had a doctorate in science, and was friends with a local deputy public defender. They had had lunch the previous day, and J. had recently attended her baby shower. He saw her about once a week, she had visited his home, and she had discussed her work with him. She talked to J. about local deputy prosecutors and public defenders, but not

---

[2] We granted the applications of Equality California, Lambda Legal, and the National Center for Lesbian Rights' (collectively Equality California), and of the Los Angeles County Public Defender's Office (LA Public Defender) to appear as amici curiae.

3

about the prosecutor in this case. She told J. "she would never go to the dark side," meaning become a prosecutor. J. said he could make a decision based on the facts of the case. J. conceded he was biased against firearms and thought the Second Amendment should be repealed, but said his personal views about firearms would not prevent him from following the judge's instructions. After the prosecutor probed the topic of firearms further, J. said he had no other biases: "No, I think that's about it, you know, based on what I know about this case, that would be [the] only thing." He was then reminded by the prosecutor that he would need to examine "all the evidence together" and asked, "you are *comfortable with that only bias that you [sic] had indicated was the issue with the second amendment . . . ,* correct?" J. answered: "Yes, that would be *absolutely correct.*" (Italics added.) A short time later, the prosecutor exercised a peremptory challenge against him.

After seven other prospective jurors were questioned and some were challenged by different sides, L. was questioned. He had graduated from high school and owned a travel agency. He said there was "absolutely no reason why [he could not] be fair."

The prosecutor asked whether L. could listen to testimony from a witness who visited a male prostitute and judge that person's credibility fairly. L. said he "definitely" could do so without prejudging the witness. L. responded "no" when asked whether he believed that persons engaged in illegal activities deserved what they get. He said "yes" when asked whether he could share his opinion about the facts of the case, work with others in applying those facts to the law, and use common sense to reach a decision.

When the prosecutor challenged L., codefendant Sharpe's counsel made a *Wheeler* motion, arguing the prosecutor systematically used peremptory challenges to excuse the

only two openly gay men in the venire. Defendant's counsel joined the motion. The trial court "at this point" found sexuality was a protected category and considered the motion.[3]

The prosecutor then gave his reasons for striking these two prospective jurors.

The prosecutor said he challenged J. because of J.'s close relationship with a public defender, particularly because she had discussed the personality traits of local prosecutors with J. and told J. she considered prosecutors to be on "the dark side."

The prosecutor said he challenged L. based on demeanor, stating that when defendant's counsel got up, L. leaned forward and seemed more attentive, but when the prosecutor spoke, L. leaned back and gave answers that were short and not descriptive.

The prosecutor then added the following rationale about both men:

> "In addition, in a case in which the victim in the case is in a relationship and is not in a relationship with a female but is not out of the closet and actually was untruthful with the police about the extent of his relationship with a male prostitute, *I think that that particular [persons'] testimony may be viewed with bias [by] those who are willing to be openly gay* and not -- not lie about it and can be frank about it, and he would view that as a negative character trait, and an individual who attempts to maintain given whatever grave idea, sexuality he has, but is willing to lie about it.

> "So I think there is a number of reasons, both specific to the case that are sexuality neutral, not -- I'm not asserting [*sic*, conceding?] in any way that is an adequate basis for [a] Wheeler motion, but even given that *I think there are [bases] not only in their reaction in court in answering questions, but also given the specific facts of this case*." (Italics added.)

To this explanation, Sharpe's counsel responded that "[u]nder that justification, anyone who is openly gay" would automatically be challenged.

The trial court denied the defense motion, questioning in passing whether a *Wheeler* motion based on sexuality discrimination was appropriate.

---

[3] Although the parties referred only to *Wheeler*, a *Wheeler* objection preserves a *Batson* claim. (See *People v. Lenix* (2008) 44 Cal.4th 602, 610, fn. 5 (*Lenix*).)

Citing J.'s relationship with the public defender and her "dark side" comment about prosecutors, the trial court found the prosecutor's challenge to J. was justified. As for L., the trial court accepted the prosecutor's demeanor-based rationale for the challenge. Because the trial court made no response to Sharpe's counsel's pointed objection, we presume the trial court simply found the facially non-discriminatory reasons were sufficient and had no need to address the effect of the last reason. In effect, that was the rough equivalent to applying a mixed-motive analysis to the challenges.

DISCUSSION

Defendant contends the trial court erred in denying his *Batson/Wheeler* motion because, in his view, the prosecutor impermissibly excused two openly gay jurors based on unsupported assumptions predicated on their sexual orientation. We agree.

I

*General Principles for Evaluating Peremptory Challenges*

Both the state and federal Constitutions prohibit using peremptory challenges to remove prospective jurors based solely on group bias. (*Wheeler, supra,* 22 Cal.3d at p. 272; *Batson, supra,* 476 U.S. at pp. 85-88.) "It is well settled that '[a] prosecutor's use of peremptory challenges to strike prospective jurors on the basis of group bias—that is, bias against "members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds"—violates the right of a criminal defendant to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution.' " (*People v. Hamilton* (2009) 45 Cal.4th 863, 898 (*Hamilton*); see *Wheeler,* at p. 272.) "Such a practice also violates the defendant's right to equal protection under the Fourteenth Amendment to the United States Constitution." (*Hamilton,* at p. 898.)

Although the United States Supreme Court has yet to address whether *Batson* extends to sexual orientation, the Ninth Circuit held in *SmithKline Beecham Corp. v.*

6

*Abbott Labs.* (9th Cir. 2014) 740 F.3d 471, 484, that it does, relying heavily on the high court's decision in *United States v. Windsor* (2013) 570 U.S. 744 [186 L.Ed.2d 808], which held that the Defense of Marriage Act's definition of marriage as excluding same-sex partners violated equal protection and due process. (See also *Obergefell v. Hodges* (2015) 576 U.S. ___ [192 L.Ed.2d 609] [recognizing a federal constitutional right for same-sex marriages]; *In re Marriage Cases* (2008) 43 Cal.4th 757, 840-844[4] [sexual orientation is a suspect classification for purposes of California's equal protection clause].) Our colleagues in the Fourth District have found that excluding homosexuals on the basis of group bias violates the California Constitution. (See *People v. Garcia* (2000) 77 Cal.App.4th 1269, 1275, 1280-1281.) Like *Garcia* and *SmithKline*, we, too, find that excluding prospective jurors solely on the basis of sexual orientation runs afoul of the principles espoused in *Batson* and *Wheeler*.

To determine whether a prosecutor impermissibly used peremptory challenges to remove prospective jurors based on a group bias such as sexual orientation, courts engage in a three-part analysis. (See *Hamilton, supra,* 45 Cal.4th at pp. 899-900.) A defendant must first make a prima facie case by demonstrating that the facts give rise to an inference of discriminatory purpose. (See *People v. Cornwell* (2005) 37 Cal.4th 50, 66, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) If that showing is made, the burden next shifts to the prosecution to explain its challenge on the basis of permissible, group-neutral justifications. (See *Cornwell,* at pp. 66-67.) If such an explanation is offered, the trial court then decides whether purposeful group discrimination occurred. (See *Cornwell,* at p. 67; *Johnson v. California* (2005) 545 U.S. 162, 168 [162 L.Ed.2d 129, 138].)

---

[4] The practical holding of *In re Marriage Cases*, that same-sex marriage was legal in California, was subject to a long series of events not necessary to describe here; what is important for our purposes is the state equal protection holding, which was left intact.

7

In this case, because the prosecutor gave reasons for his peremptory challenges, we proceed to the second and third steps to determine whether the trial court erred in concluding that they were valid. (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1106, disapproved on other grounds in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.)

" 'We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.' " (*Hamilton, supra,* 45 Cal.4th at p. 901.) A prosecutor's justification, moreover, need not support a challenge for cause (see *Batson, supra,* 476 U.S. at p. 97), and even a trivial reason, a hunch, or an arbitrary exclusion, if genuine and neutral, will suffice (see *Hamilton,* at p. 901).

We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges with restraint. (See *People v. Thomas* (2011) 51 Cal.4th 449, 474.) The trial court's determination is a factual one, and so long as the trial court makes a sincere and reasoned effort to evaluate the justifications offered, its conclusions are entitled to deference on appeal when they are supported by substantial evidence. (See *Hamilton, supra,* 45 Cal.4th at pp. 900-901; *Thomas,* at p. 474.) The issue is whether the trial court finds the prosecutor's explanation to be credible, based on factors such as the reasonableness of the explanation, the prosecutor's demeanor, and the trial court's own observations of the voir dire. (See *Lenix, supra,* 44 Cal.4th at p. 613.) With these principles in mind, we turn to the specific challenges under review.

II

*The Peremptory Challenges in this Case*

We have no trouble upholding the trial court's findings that the prosecutor had facially valid reasons for challenging these jurors. J.'s relationship with a deputy public defender who thought prosecutors worked for the "dark side" could trouble any prosecutor, and L.'s terse answers and negative body language (something the trial court

8

could observe but that we cannot second-guess on a cold transcript) could also give reasonable cause for concern. (See *Lenix, supra,* 44 Cal.4th at p. 623 [perceived bias against prosecution]; see also *id.* at p. 613 ["facial expressions, gestures, hunches"]; *People v. Reynoso* (2003) 31 Cal.4th 903, 924-925 [where prosecutor sees "the potential juror glare at him, or smile at the defendant or defense counsel"].)

But the prosecutor then proffered another reason applicable to *both* prospective jurors. The prosecutor explained that *because both of these jurors were openly gay*, he thought they might be biased against the closeted victim, the main witness.

Defendant argues this additional reason is baldly discriminatory and no different from a similar one rejected in *Batson*: A prosecutor cannot assume a prospective juror would be more partial to a defendant of the same race. (*Batson, supra,* 476 U.S. at p. 97 [recognizing that the equal protection clause "forbids the States to strike black veniremen on the assumption that they will be biased in a particular case simply because the defendant is black"].) We agree.

We acknowledge that a challenge based solely on a prospective juror's membership in a particular group is different from a challenge " 'which may find its roots in part [in] the juror's attitude about the justice system and about society which may be [group] related.' " (*Hamilton, supra* 45 Cal.4th at pp. 901-902.) In *Hamilton*, for example, our Supreme Court upheld a peremptory challenge where the prosecutor said one of the reasons he struck a prospective juror was because he had " 'considerable sympathy for Black people on trial' and thought the justice system was unfair to Blacks." (*Id.* at p. 901.) In finding substantial evidence supported the challenge, the court implicitly rejected the defendant's argument that the reason was not race neutral but rather based on race itself. (*Id.* at pp. 901-902.) The court found the juror's responses to several questions on a questionnaire indicated he was skeptical about the fair treatment of Blacks by the criminal justice system, thus supporting the prosecutor's concerns, even if they were tangentially related to race. (*Id.* at p. 902.) Similarly, in *People v. Martin*

9

(1998) 64 Cal.App.4th 378, the prosecutor struck a Jehovah's Witness because, in his experience, " 'they couldn't judge anybody at all.' " (*Id.* at p. 381.) Although the prospective juror "did not express actual reservations about her ability to deliberate," the court nevertheless found the "prosecutor's perception that the juror's religious views might render her uncomfortable with sitting in judgment of a fellow human being was a specific bias related to the individual juror's suitability for jury service." (*Id.* at p. 384.)

*Hernandez v. New York* (1991) 500 U.S. 352 [114 L.Ed.2d 395] affirmed a finding that a prosecutor's reason for striking two Latino jurors was race-neutral and genuine; the prosecutor had excused them because their demeanor and responses caused him to doubt their ability to defer to the official translation of Spanish-language testimony anticipated at trial. (*Id.* at pp. 356-357 (plur. opn.).) The fact such reasoning might disproportionately impact prospective Latino jurors did not make it improper. (*Id.* at pp. 361-363.) In a concurring opinion, Justice O'Connor, joined by Justice Scalia, aptly observed that *Batson* "does not require that the [prosecutor's] justification be unrelated to race. *Batson* requires only that the prosecutor's reason for striking a juror not *be* the juror's race." (*Id.* at p. 375 (conc. opn. of O'Connor, J.).)

Following this line of reasoning, we can certainly imagine a case where an openly gay venireperson *who expressed contempt for or distrust of* closeted homosexuals could properly be stricken, because the reason would not be their sexuality, but their inability to fairly judge testimony of closeted homosexuals, simply because they have chosen to remain closeted. But that is not what happened here.

Both veniremen said they could be fair, and neither expressed concerns about closeted homosexuals. The bias alleged by the prosecutor was a product of the prosecutor's impermissible group assumptions, unsupported by the record and based solely on the two jurors' sexuality. The prosecutor specifically asked the panel whether "anybody [had] an automatic reaction where they would vote guilty or not guilty because some of the people involved in this case, either witnesses or people who are accused are

homosexual." No one responded in the affirmative. Thus, this is not a case where a challenge touching on homosexuality, but not based on it, is in play. The prosecutor gave as a reason for his challenge his *assumption* that the only two openly gay veniremen would look askance at the victim's lifestyle simply because they were openly gay and he was not. Whether intended or not, that rationale reflects invidious sexuality discrimination that is not permissible.

## III

### *The Remedy for Invalid Challenges*

We must now consider the effect, if any, of the trial court's finding that the prosecutor's *other* reasons were sufficient to continue with jury selection, or whether the trial court erred by not implementing a remedy for the *Batson*/*Wheeler* violation.[5]

Although many jurisdictions have considered whether to apply a per se, mixed-motive, or substantial motivating factor approach in the face of an invalid challenge, neither the United States Supreme Court nor our Supreme Court has done so. (See *Snyder v. Louisiana* (2008) 552 U.S. 472, 485 [552 L.Ed.2d 175, 186] [not deciding whether mixed-motive analysis applies in *Batson* context]; *People v. Schmeck* (2005) 37 Cal.4th 240, 276-277 [declining to address whether a mixed-motive analysis should be used], overruled on other grounds by *People v. McKinnon* (2011) 52 Cal.4th 610, 637-638.) Accordingly, we must decide which approach to adopt.

Some jurisdictions, primarily federal, have adopted a mixed-motive or dual motive analysis derived from non-*Batson* equal protection or statutory-based cases. (See e.g., *Howard v. Senkowski* (2d Cir. 1993) 986 F.2d 24, 26-27 & see esp. fns. 1 & 2 (*Howard*);

---

[5] Normally a successful *Wheeler* motion requires dismissal of the panel and restarting jury selection, but if the movant consents, a trial court may implement lesser remedies, such as sanctioning the offending attorney or seating the improperly challenged juror(s). (See *People v. Mata* (2013) 57 Cal.4th 178, 182-186; *People v. Singh* (2015) 234 Cal.App.4th 1319, 1327-1328.)

11

*Gattis, supra,* 278 F.3d at pp. 232-235; *Jones v. Plaster* (4th Cir. 1995) 57 F.3d 417, 420-422; *United States v. Darden* (8th Cir. 1995) 70 F.3d 1507, 1531-1532; *Wallace v. Morrison* (11th Cir. 1996) 87 F.3d 1271, 1274-1275.)  Under the mixed-motive approach, "[o]nce the claimant has proven improper motivation, dual motivation analysis is available to the person accused of discrimination to avoid liability by showing that the same action would have been taken in the absence of the improper motivation that the claimant has proven." (*Howard,* at p. 27; see *Gattis,* at p. 233.)  But phrased another way, under the mixed-motive analysis, "the Court allows those accused of unlawful discrimination to prevail, *despite clear evidence of racially discriminatory motivation*, if they can show that the challenged decision would have been made even absent the impermissible motivation, or, put another way, that the discriminatory motivation was not a 'but for' cause of the challenged decision." (*Kesser v. Cambra* (9th Cir. 2006) 465 F.3d 351, 372 (conc. opn. of Wardlaw, J.) (*Kesser*), italics added.)

The Ninth Circuit has instead adopted a substantial motivating factor approach, limiting its inquiry to "whether the prosecutor was 'motivated in substantial part by discriminatory intent.' " (*Cook v. LaMarque* (9th Cir. 2010) 593 F.3d 810, 814-815.) Under this test, if a bad reason is given, it can be ignored so long as the prosecutor's motivation is not substantially driven by it. (*Id.* at p. 826 ["the prosecutor gave both persuasive and unpersuasive justifications for his strikes.  Even assuming the unpersuasive grounds were actually pretext, we cannot conclude his strikes were ultimately motivated in substantial part by race"].)

Defendant and amicus curiae Equality California urge us to adopt the per se rule, contending that when a party offers multiple rationales for a peremptory strike, only some of which are permissible, the taint from the impermissible reason(s) mandates reversal. The LA Public Defender urges us to adopt the Ninth Circuit's substantial motivating factor approach, arguing the per se rule may be too restrictive in some cases and the

12

mixed-motive approach may be too permissive in others. The Attorney General urges us to adopt the mixed-motive approach, if we must choose one.

As indicated, both the substantial factor and mixed-motive approaches permit strikes based in part on invalid reasons. In this case, the prosecutor admitted to striking the only two gay veniremen known to be on the jury, expressly because they were known to be gay. We endorse the following view, while acknowledging that it is not precedential: "To excuse such prejudice when it does surface, on the ground that a prosecutor can also articulate [valid] nonracial factors for his challenges, would be absurd." (*Wilkerson v. Texas* (1989) 493 U.S. 924, 928 [107 L.Ed.2d 272, 275] (Marshall, J., dissenting from denial of certiorari).)

The "mixed motive" concept arose in non-*Batson* contexts, such as in employment discrimination lawsuits, where a defendant-employer seeks to show that the adverse action would have been taken against the plaintiff-employee regardless of any racial or other invidious animus. (See *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle* (1977) 429 U.S. 274, 287 [50 L.Ed.2d 471, 483-484] [district court should have determined whether the board could show it would not have rehired a teacher who engaged in constitutionally protected speech in the absence of the teacher's protected conduct]; *Kesser*, *supra*, 465 F.3d at p. 373 [in non-*Batson* contexts, the high court "has consistently and repeatedly applied mixed-motive analysis where both permissible and impermissible motivations are present"]; Cox, *The "Tainted Decision-Making Approach": A Solution for the Mixed Messages Batson Gets from Employment Discrimination* (2006) 56 Case W. Res. Law Rev. 769, 782-789 [describing the civil law origin of mixed-motive analysis, and arguing it should not be extended to *Batson* error].)

"[A]lthough the initial three-step framework of *Batson* does derive from Title VII jurisprudence, the 'but for' causation requirement that has been applied in those contexts [citations], is not appropriate in the distinct *Batson* context. The difficult task of 'ferreting out discrimination' would be made nearly impossible by a 'but for' causation

13

requirement, which would require a court to engage in counterfactual reasoning, often with only a sparse record to guide it. [Citation.]" (*Cook v. LaMarque*, *supra*, 593 F.3d at p. 828 (conc. & dis. opn. of Hawkins, J.).) Further, the mixed-motive approach does not translate well to a *Batson* situation where the question is not *only* whether a prospective juror would have been challenged anyway, but also implicates systemic fairness.

For this reason, many--if not most--of our sister state courts have rejected application of a "mixed motive" or "dual motivation" analysis. (See, e.g., *McCormick v. State* (Ind. 2004) 803 N.E.2d 1108, 1113 ["it is not appropriate to apply the dual motivation analysis in the *Batson* context;" one biased "challenge tainted any nondiscriminatory reasons"]; *State v. Lucas* (Ariz. App. 2001) 199 Ariz. 366, 369 [18 P.3d 160, 163] ["any consideration of a discriminatory factor directly conflicts with the purpose of *Batson* and taints the entire jury selection process"]; *Payton v. Kearse* (1998) 329 S.C. 51, 59 [495 S.E.2d 205, 210] ["Once a discriminatory reason has been uncovered -- either inherent or pretextual -- this reason taints the entire jury selection procedure"]; *Riley v. Commonwealth* (1995) 21 Va.App. 330, 336 [464 S.E.2d 508, 510] [gender bias; "The fact that the Commonwealth [also] used age to identify which women to strike does not overcome the constitutional infirmity"]; *Rector v. State* (1994) 213 Ga.App. 450, 454 [444 S.E.2d 862, 865] [trial court erred in ruling a "purportedly race neutral explanation cured the element of the stereotypical reasoning employed by the State's attorney"]; *Ex parte Sockwell* (Ala. 1995) 675 So.2d 38, 41*; McCray v. State* (Ala. Crim.App. 1998) 738 So.2d 911, 914 [following *Sockwell*; "in Alabama, a race-neutral reason . . . will not 'cancel out' a race-based reason"]; *Strozier v. Clark* (1992) 206 Ga.App. 85, 88 [424 S.E.2d 368, 371] [" 'Even though [appellee's counsel] may have given one racially neutral explanation, the racially motivated explanation "vitiates the legitimacy of the entire (jury selection) procedure" ' "]; *State v. King* (Wisc.App. 1997) 215 Wis. 2d 295, 306-309 [572 N.W.2d 530, 535-536] [rejecting "dual motivation" test]; *U.S. v. Greene* (C.M.A. 1993) 36 M.J. 274, 280-281 [reviewing federal cases and

agreeing "with the untainted approach"]; see also *Robinson v. U.S.* (D.C. App. 2006) 890 A.2d 674, 679-681 [if racial bias is a "substantial part" of challenge, it is wrong despite partially unbiased reasons]; cf. *People v. Turner* (2001) 90 Cal.App.4th 413, 421 [dis. opn. of Ortega, J.; "I feel it is improper to use race as even a partial reason for exercising a peremptory, even if there are myriad other valid grounds for excusing a juror"]; *Guzman v. State* (Tx. Crim.App. 2002) 85 S.W.2d 242, 256-258 [dis. opn. rejecting mixed motive analysis]; (*Kesser*, *supra*, 465 F.3d at pp. 376-377 (conc. opn. of Berzon, J.) [questioning mixed-motive test].)

Thus, the per se approach--while not universally held--is well-grounded in the law.

Further, *Wheeler* was based on independent state grounds--the right to a jury composed of a representative cross-section of the community under article I, section 16 of our constitution. (*Wheeler*, *supra*, 22 Cal.3d at pp. 265-272.) Although our Supreme Court has since followed high court decisions after *Batson*, this circumstance leads us to consider the application of another independent ground: Our own due process clause (Cal. Const., art. I, § 7, subd. (a)) has independent--and greater--force than its federal analog: It protects the dignity interest in obtaining an untainted adjudication (see *Saleeby v. State Bar* (1985) 39 Cal.3d 547, 563-565). As stated by our Supreme Court:

> " '*[E]ven in cases in which the decision-making procedure will not alter the outcome of governmental action*, due process may nevertheless require that certain procedural protections be granted the individual in order to protect important dignitary values, or, in other words, "to ensure that the method of interaction itself is fair in terms of what are perceived as minimum standard of political accountability—of modes of interaction which express a collective judgment that *human beings* are important in their own right and that they must be treated with understanding, respect, and even compassion." ' " (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 213, quoting *People v. Ramirez* (1979) 25 Cal.3d 260, 267-268, first italics added, second in *Today's Fresh Start*; see *In re Vicks* (2013) 56 Cal.4th 274, 310.)

Finally, and connected to the previous point, although perfection is neither required nor possible (see, e.g., *People v. Cunningham* (2001) 25 Cal.4th 926, 1009

15

[defendant "was entitled to a fair trial but not a perfect one"]), the judicial system must not only reach correct results, it must maintain its own dignity, or as the point has been phrased before: " ' "Not only must justice be done, but it must appear to have been done." ' " (*People v. Gordon* (1991) 229 Cal.App.3d 1523, 1526-1527.) "Taints of discriminatory bias in jury selection—actual or perceived—erode confidence in the adjudicative process, undermining the public's trust in courts." (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1154.) Indeed, *Batson* itself addresses this institutional concern:

> "The harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our system of justice. [Citations.] Discrimination within the judicial system is most pernicious because it is 'a stimulant to that race prejudice which is an impediment to securing to [black citizens] that equal justice which the law aims to secure to all others.' " (*Batson*, *supra*, 476 U.S. at pp. 87-88; see also *Miller-El v. Dretke* (2005) 545 U.S. 231, 238 [162 L.Ed.2d 196, 212] ["the very integrity of the courts is jeopardized when a prosecutor's discrimination 'invites cynicism respecting the jury's neutrality,' [citation], and undermines public confidence in adjudication"].)

Although this case does not involve race-based discrimination in challenges, as in *Batson*, the same concern for preserving the integrity--and *perceived* integrity--of the judicial system is present.

The remedy for the error in this case is reversal for an untainted trial.[6]

---

[6] We use the term "prosecutorial error" rather than the at times misleading term "prosecutorial misconduct," because we are not concerned with the prosecutor's culpable mental state, but with the lawfulness of the reasons given for exercising the peremptory challenges. (Cf. e.g., *People v. Centeno* (2014) 60 Cal.4th 659, 666-667.)

DISPOSITION

The judgment is reversed.

                                               /s/
                                       Duarte, J.

I concur:

     /s/
Blease, Acting P. J.

Hull, J.

Defendant was tried before an impartial judge and found guilty beyond a reasonable doubt by an unbiased jury while represented by competent counsel. Even so, the majority mandates *per se* reversal of defendant's convictions because the prosecutor offered a "nonneutral" reason in addition to stating two facially valid reasons for challenging two openly gay jurors during *voir dire*. (Maj. opn. at p. 15.) The majority reaches this conclusion even though the record is devoid of any evidence showing the nonneutral reason was determinative in striking the prospective jurors or that the two facially valid reasons were unsupportable.

In our analysis of this assertion of error, it is important to focus on what exactly occurred in the trial court. The People did not strike the two jurors because they were gay men. The People exercised peremptory challenges against these two prospective jurors, in part, because of a perhaps unwarranted concern that the two prospective jurors who had openly acknowledged their sexual orientation would be biased against the People's victim who apparently, until the events that unfolded leading to this prosecution, had *not* openly acknowledged his sexual orientation.

To put the issue before us further into perspective, given the prosecutor's apparent concerns regarding how jurors would view the victim of this crime, the prosecutor would have been in fair territory during *voir dire* if the prosecutor, after noting for the prospective jurors that the victim of this crime was a gay man who had not before openly acknowledged his sexual orientation, had inquired of *all* the prospective jurors whether there was any reason why this victim, and thus the prosecution, could not receive a fair trial simply because the victim was a gay man, or because the victim had not acknowledged his sexual orientation openly before the events leading to the commission of this crime. Had the prosecution done so and had *any* of the prospective jurors answered those questions in a way that legitimately placed into question whether that

1

prospective juror could be fair and impartial to both sides in judging the facts of the case, a valid challenge would have been the result.

Put simply, the majority reverses the defendant's conviction for a serious crime, otherwise fairly obtained, because the prosecutor exercised a peremptory challenge that *may have* been based solely on an unwarranted assumption concerning the views of openly gay men.

In any event, the *per se* test the majority adopts today misses a proper balance; the prosecutor may well have legitimately stricken the two prospective jurors *regardless of* their sexual orientation. The mixed motive approach, by contrast, strikes the proper balance between protecting a defendant's constitutional rights, preserving the public's confidence in the fairness of our system of justice, and recognizing the institutional interest in the finality of judgments. As we originally concluded, I would adopt the mixed motive approach whenever a party offers both neutral and nonneutral reasons for exercising a peremptory strike, and I would remand the matter here for the trial court to apply the mixed motive approach in the first instance.

I therefore dissent.

An argument can be made that there is no *Batson/Wheeler* violation here at all. (See e.g., *Hernandez v. New York* (1991) 500 U.S. 352; *People v. Hamilton* (2009) 45 Cal.4th 863; *People v. Martin* (1998) 64 Cal.App.4th 378.) *Batson/Wheeler*, as this field of jurisprudence has become known, is a nebulous area of the law. (*Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69]; *People v. Wheeler* (1978) 22 Cal.3d 258 (*Batson/Wheeler*).) Where the line is drawn between constitutionally legitimate informed guesses about an individual juror's mind set given that juror's demographics and answers during jury selection (a guess that drives nearly every peremptory challenge a trial lawyer makes and a guess that has given rise to an industry predicting the mind set of given jurors based on demographics) and unconstitutional discrimination in jury selection is often unclear. One hopes for some added clarity in the future.

2

But the parties and amici and the majority have litigated and decided this matter on the assumption that the *Batson/Wheeler* doctrine is here in play and I will address only the proper remedy in this case.

I note at this point the majority characterizes the trial court's failure to address the sexuality-related reason as the "rough equivalent" to applying a mixed motive analysis to the challenges. (Maj. opn. at p. 6.) Not so. Because the trial court never considered the sexuality-related reason for the challenge at all, it did not engage in the analysis required by the mixed motive approach. That is, the court never placed the burden on the prosecutor to show that the potential jurors would have been excused even had the impermissible purpose not been considered; that is, put differently, that an impermissible reason was not the determining factor in excusing the two jurors from the panel.

The majority has "no trouble upholding the trial court's findings that the prosecutor had facially valid reasons for challenging" the two jurors (maj. opn. at p. 8), but concludes that defendant's convictions must be reversed nonetheless. The majority does so for several reasons, none of which are convincing.

First, as support for rejecting the mixed motive approach that we initially adopted, the majority cites *Wilkerson v. Texas* (1989) 493 U.S. 924 [107 L.Ed.2d 272] (Marshall, J., dissenting from denial of certiorari), in which the United States Supreme Court denied certiorari over the dissent of Justice Marshall. (Maj. opn. at p. 13.) The prosecutor in *Wilkerson* conceded that race was one of many factors in his peremptory strikes of several black jurors, and Justice Marshall would have granted the petition to determine whether a prosecutor's exercise of peremptory challenges based in part on racial considerations violates the Equal Protection Clause. (*Id.*, *supra*, 493 U.S. at pp. 924-925.) In his dissent, Justice Marshall argued that the mixed motive analysis was inappropriate in the *Batson* context, and that excusing prejudice when it surfaces on the ground that a prosecutor can also articulate neutral reasons for a strike would be "absurd." (*Id.* at pp. 926-928.)

3

The majority's reliance on *Wilkerson* rests on shaky grounds. Statements accompanying denials of certiorari have no binding or precedential value. As Justice Stevens emphasized in an opinion respecting the denial of the petition for writ of certiorari in *Singleton v. C.I.R.* (1978) 439 U.S. 940 [58 L.Ed.2d 335], all opinions dissenting from the denial of certiorari are "totally unnecessary" and are "examples of the purest form of dicta, since they have even less legal significance" than the Court's order denying certiorari which has no precedential significance at all. (*Id.* at pp. 944-945; see also *In re I.F.* (2018) 20 Cal.App.5th 735, 764.) Justice Stevens further noted that such opinions are also "potentially misleading." (*Singleton,* at p. 945.) Because the Court "provides no explanation of the reasons for denying certiorari, the dissenter's arguments in favor of a grant are not answered and therefore typically appear to be more persuasive than most other opinions." (*Ibid.*)

Next, the majority rejects the mixed motive approach because, in the majority's view, it has been adopted only in non*Batson* contexts such as employment discrimination lawsuits. (Maj. opn. at p. 13.) But *Batson* itself states that, "[a] recurring question in these [jury discrimination] cases, *as in any case alleging a violation of the Equal Protection Clause*, was whether the defendant had met his burden of proving purposeful discrimination on the part of the State." (*Batson, supra*, 476 U.S. at p. 90; italics added.) Thus, as the Second Circuit recognized in *Howard v. Senkowski* (2d Cir. 1993) 986 F.2d 24, 27 (*Howard*), *Batson* "plac[ed] the issue squarely within the tradition of equal protection jurisprudence."

*Batson,* moreover, explicitly relied on the Court's prior equal protection jurisprudence as articulated in cases such as *Village of Arlington Heights v. Metropolitan Housing Development Corporation* (1977) 429 U.S. 252, 271 [50 L.Ed.2d 450, 468] (*Arlington Heights*). (See, e.g., *Batson, supra,* 476 U.S. at pp. 93-94.) There, the plaintiffs had failed to carry their burden of showing that a racially discriminatory

4

purpose was a substantial motivating factor in an agency's decision to deny a rezoning application. (*Arlington Heights*, at p. 271.)

*Arlington Heights* expressly recognized the following: "[p]roof that the decision by the Village was motivated in part by a racially discriminatory purpose would not necessarily have required invalidation of the challenged decision. Such proof would, however, have shifted to the Village the burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered. If this were established, the complaining party in a case of this kind no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose. In such circumstances, there would be no justification for judicial interference with the challenged decision." (*Arlington Heights, supra,* 429 U.S. at p. 270, fn. 21.) The high Court was undoubtedly aware of its decision in *Arlington Heights*, including the mixed motive analysis the opinion expressly sanctions, when favorably citing the opinion in *Batson*. (*Batson, supra,* 476 U.S. at pp. 93-94.)

And contrary to the majority's implicit suggestion that the mixed motive approach is better suited in the employment discrimination context rather than in the jury selection context (maj. opn. at p. 13), the Supreme Court has applied the mixed motive approach in other areas of similar constitutional magnitude to selecting an impartial jury.

For example, in *Hunter v. Underwood* (1985) 471 U.S. 222, 228 [85 L.Ed.2d 222] (*Hunter*), the Supreme Court applied a mixed motive analysis when determining the constitutionality of a provision in the Alabama Constitution that disenfranchised persons convicted of crimes involving moral turpitude. Evidence showed that although the law was neutral on its face, applying equally to anyone convicted of one of the enumerated crimes, the purpose of the law was to disenfranchise blacks. (*Id.* at pp. 227-229.)

Notably, in *Hunter* the state argued that the existence of a permissible motive for the state constitutional provision, the disenfranchisement of poor whites, trumped any proof of a parallel impermissible motive of disenfranchising blacks. (*Hunter, supra,* 471

5

U.S. at pp. 231-232.)  Without deciding whether the intentional disenfranchisement of poor whites would qualify as a " 'permissible motive,' " the court found that "where both impermissible racial motivation and racially discriminatory impact are demonstrated, *Arlington Heights* and *Mt. Healthy* [*City Sch. Dist. Bd. of Educ. v. Doyle* (1977) 429 U.S. 274, 287 [50 L.Ed.2d 471, 483-484] (*Mt. Healthy*)] supply the proper analysis."  (*Id.* at p. 232.)  An additional purpose to discriminate against poor whites, even if considered permissible, "would not render nugatory the purpose to discriminate against all blacks," since the evidence showed the latter was the true motivation for the provision.  (*Ibid.*)

In a government by the people and for the people, the critical nature of the right to vote is manifest.  (*Reynolds v. Sims* (1964) 377 U.S. 533, 555 [12 L.Ed.2d 506, 523] ["The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government"].)  So, too, is the right to a trial by an impartial jury selected pursuant to nondiscriminatory criteria.  (*Batson, supra,* 476 U.S. at pp. 85-86.)  The mixed motive approach, relied upon by the Court in *Hunter* to protect the sacred right to vote, is equally capable of protecting a defendant's right to a fair trial by determining if an impermissible motive was the determinative factor, or a "but for" cause, in exercising a peremptory challenge even though other permissible motives were also present.

I stress at this point that nothing in this record suggests or demonstrates that, unlike the situation in *Hunter*, the prosecutor's motivation in exercising these challenges was to discriminate against gay men.

In *Mt. Healthy, supra,* 429 U.S. 274 an untenured teacher brought an action for reinstatement to his teaching position claiming that, in fact, he had been dismissed from his teaching position for exercising his right to free speech.

In its holding the Supreme Court set forth a portion of the district court's findings:

"The District Court made the following 'conclusions' on this aspect of the case:

6

"1) If a non-permissible reason, e.g., exercise of First Amendment rights, played a substantial part in the decision not to renew - even in the face of other permissible grounds - the decision may not stand (citations omitted).

"2) A non-permissible reason did play a substantial part. That is clear from the letter of the Superintendent immediately following the Board's decision, which stated two reasons - the one, the conversation with the radio station clearly protected by the First Amendment. . . .

"At the same time, though, [the District Court] stated that '(i)n fact, as this Court sees it and finds, both the Board and the Superintendent were faced with a situation in which there did exist in fact reason . . . independent of any First Amendment rights or exercise thereof, to not extend tenure.' " (*Mt. Healthy*, *supra,* 429 U.S. at pp. 284-285.)

Ultimately, the Supreme Court held that:

"Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor' – or, to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's re-employment even in the absence of the protected conduct." (*Mt. Healthy, supra,* 429 U.S. at p. 286.)

The Supreme Court returned the matter to the district court to reconsider its holding applying that test.

The majority's concern that ferreting out discrimination is a "difficult task" (maj. opn. at p. 13) does not present an insurmountable problem of proof for trial courts and shows little faith in trial court judges' abilities in ferreting out impermissible discrimination. Trial courts already face such demands when evaluating *Batson/Wheeler* challenges. Just as I am confident in a " 'trial court's ability to distinguish bona fide

7

reasons from sham excuses' " for a strike (*People v. Hamilton* (2009) 45 Cal.4th 863, 901), I am equally confident that the trial court, after considering the totality of the circumstances in each particular case, will be able to discern whether an improper reason for striking a potential juror was determinative even though other permissible reasons for the strike also motivated the peremptory challenge.  Our Supreme Court has "asked trial courts to undertake possibly even more difficult tasks." (*People v. Johnson* (2006) 38 Cal.4th 1096, 1101-1102 [acknowledging difficulties in ordering limited remand for trial court to determine the second and third steps of *Batson* analysis after the trial court erroneously concluded nearly eight years earlier that the defendant had failed to make a prima facie showing of racial discrimination]; *Marks v. Superior Court* (2002) 27 Cal.4th 176 [remand of capital case to the trial court over seven years after trial to settle the appellate record in various ways].)

"As with all other inquiries concerning mental state, the ultimate determination is an inference from all the pertinent circumstances, whether or not an acknowledgement [that an improper reason was a determinative factor in motivating a strike] occurs." (*Howard, supra,* 986 F.2d at p. 31.)  "Simply because fact-finding on an issue of mental state like motivation is difficult is no reason to alter the normal approach to fact-finding nor to diminish confidence in the force of a witness's oath or in a trier's ability to ascertain facts." (*Ibid.*)  Like the Second Circuit in *Howard,* I "have every confidence that trial judges can be relied upon to determine the true facts of the prosecutor's motive, just as they are relied upon to determine subjective mental states of parties and witnesses in all manner of cases." (*Ibid.*)

Nor do I accept the cynical view that the mixed-motive approach is a gateway to extensive abuse.  Although amicus suggest that mixed-motive analysis will allow myriads of prosecutors to exhibit obvious unlawful bias against potential jurors and then cure the violation by offering vague, neutral explanations, I am "unwilling to accept the premise of this argument that prosecutors will readily disregard the obligations of their office and

8

violate the requirements of an oath by swearing false denials of [discriminatory group bias] motivation." (*Howard, supra,* 986 F.2d at p. 31.) Based on the trial court's observations of a trial lawyer's demeanor, questioning, and the overall *voir dire* process, I believe trial courts are well equipped for those instances, where such dissembling may occur, to recognize that vague neutral reasons for a particular strike were not in fact the true motivation behind that strike.

That other states have adopted the *per se* test does not convince me the mixed motive approach is improper in the *Batson* context. (Maj. opn. at p. 14.) Several federal courts that have considered the issue, as the majority concedes (maj. opn. at p. 11), have found no impediment to applying the mixed motive approach in similar cases. (See e.g., *Howard, supra,* 986 F.2d at p. 27; *Gattis v. Snyder* (3d Cir. Del. 2002) 278 F.3d 222, 233; *Jones v. Plaster* (4th Cir. 1995) 57 F.3d 417, 420-422; *United States v. Darden* (8th Cir. 1995) 70 F.3d 1507, 1530-1532; *Wallace v. Morrison* (11th Cir. 1996) 87 F.3d 1271, 1274-1275.)

And, unlike the mixed motive approach, the *per se* approach permits a court to disregard all of the circumstances present in a particular case by focusing on a single reason for a strike even though more than one reason may have motivated a party to challenge a specific juror. (*Howard, supra,* 986 F.2d at p. 26 ["A person may act for more than one reason"].) At the final stage of a *Batson/Wheeler* analysis, however, "courts must consider ' " '*all relevant circumstances*' " ' in determining whether a strike was improperly motivated, and this requires *a careful 'review of the entire record.*' " (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1176 (conc. opn. of Liu, J.); italics added.) *Batson* teaches that "[w]hen circumstances suggest the need, the trial court must undertake a 'factual inquiry' that '*takes into account all possible explanatory factors*' in the particular case." (*Batson, supra,* 476 U.S. at p. 95; italics added.) One such relevant circumstance is whether a party would have properly stricken a prospective juror for a valid reason regardless of an invalid reason that partially motivated the strike.

9

In choosing the mixed motive approach, I am also guided by United States Supreme Court precedent. The United States Supreme Court's decision in *Rice v. Collins* (2006) 546 U.S. 333, 336 [163 L.Ed.2d 824, 830] (*Rice*) convinces me that the *per se* approach need not apply when evaluating dual motivation cases. In that case, the prosecutor gave several race-neutral reasons for striking a black juror including the prosecutor's effort to obtain gender balance on the jury. (*Id.* at p. 340.) On a habeas petition, the Ninth Circuit found the trial court should have questioned the prosecutor's credibility in citing other race-neutral reasons for striking the juror once the prosecutor attempted to use gender as a race-neutral reason for striking the juror in question. (*Ibid.*)

After first acknowledging that discrimination in the jury selection process based on gender violates the Equal Protection Clause (*Rice, supra,* 546 U.S. at p. 340, citing *J.E.B. v. Alabama ex rel. T.B.* (1994) 511 U.S. 127 [128 L.Ed.2d 89]), the Supreme Court nevertheless concluded that the Ninth Circuit had "assigned the gender justification more weight than it can bear." (*Rice,* at pp. 340-341.) The courted noted that, "[t]he prosecutor provided a number of other permissible and plausible race-neutral reasons, and [the defendant] provide[d] no argument why this portion of the colloquy demonstrates that a reasonable factfinder must conclude the prosecutor lied about the eye rolling and struck [the juror] based on her race." (*Id.* at p. 341.) Had the *per se* approach applied, the improper justification for the strike (gender neutrality) would have mandated reversal even if the other reasons given were nondiscriminatory.

While I do not imply that *Rice* silently adopted a mixed motive analysis, since the Supreme Court has made clear that it has not decided the issue (*Snyder v. Louisiana* (2008) 552 U.S. 472, 485 [170 L.Ed.2d 175] [discussing but not deciding whether mixed-motive analysis applies in *Batson* context]), I merely point out that *Rice* implicitly shows that a *per se* approach is not necessarily mandated for evaluating dual motivation *Batson/Wheeler* challenges.

The Supreme Court's recent decision in *Tharpe v. Sellers* (2018) -- U.S. – [199 L.Ed.2d 424], 2018 WL 311568, also provides guidance here. The black defendant in *Tharpe* moved to reopen his federal habeas corpus proceeding regarding his claim that the Georgia jury that convicted him of murdering his black sister-in-law included a white juror who was biased against him and voted for the death penalty because he was black. (*Id.* at pp. 424-426.) In returning the matter to the court of appeals, and after noting that the district court had denied the certificate of appealability on several grounds (and noting that the Court expressed no opinion as to those issues) the majority found it *debatable* whether the defendant had shown prejudice after he produced an affidavit from the white juror that expressed racist opinions about blacks. (*Id.* at pp. 424-425, 429.) The Court did not hold that the affidavit alone demonstrating racial animus required a *per se* finding that supported defendant's petition much less an automatic reversal of his sentence to death.

While it is unclear whether the fact that the white juror later recanted what was set forth in his first affidavit had a bearing on the Court's observation regarding the defendant's showing of prejudice, *Tharpe*, at a basic level, shows, at least, that a judgment of conviction need not be automatically, and always, set aside whenever discriminatory animus is shown even though the evidence also shows that such animus may not have been the determinative factor that ultimately lead to that conviction.

I am also not persuaded that our own state Constitution's due process clause (Cal. Const., art. I, § 7, subd. (a)) dictates adopting the *per se* test. (Maj. opn. at p. 15.) The dignitary interest discussed in the cases cited by the majority is the interest, through a hearing, of "informing individuals of the nature, grounds and consequences of the action and in enabling them to present their side of the story before a responsible governmental official." (*Saleeby v. State Bar* (1985) 39 Cal.3d 547, 563-565; *Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 213.) To the extent the cases cited apply at all here, under the mixed motive test, the trial judge, an impartial

11

government official, must consider all of a prosecutor's proffered reasons, both permissible and impermissible, and decide the determinative factor that motivated a strike. The burden is on the prosecutor. The defendant's due process liberty interest in both fair and unprejudiced decision making and in being treated with respect and dignity is thus protected.

Furthermore, "[i]n determining applicable due process safeguards, it must be remembered that 'due process is flexible and calls for such procedural protections as the particular situation demands.' " (*People v. Ramirez* (1979) 25 Cal.3d 260, 268.) The mixed motive approach provides the flexibility and procedural protections needed to safeguard a defendant's constitutional rights. If the prosecutor meets his burden of establishing that the same decision would have resulted even had the impermissible purpose not been considered, defendant can "no longer fairly attribute the injury complained of [here, striking the two openly gay jurors] to an improper discriminatory purpose. In such circumstances, there would be no justification for judicial interference with the challenged decision." (*Arlington Heights, supra,* 429 U.S. at p. 270, fn. 21.)

Finally, overturning a conviction by an unbiased jury simply because a prosecutor was partially motivated to strike a prospective juror for an impermissible reason when the prosecutor would have legally and justifiably stricken the juror regardless of the improper motivation not only erodes public confidence in the adjudicative process, but also threatens the finality of judgments. If a defendant has received a fair trial, there is an institutional interest in protecting the finality of the court's judgment. Theoretical imperfections ought not be treated more seriously than real deficiencies, for such skewed values would undermine confidence in the administration of justice. While I am sensitive to the appearance of perceived discriminatory bias described by the majority, I am not persuaded that a *per se* rule is required to address this concern or to protect the fairness-- actual or perceived--of judicial proceedings.

12

The majority justifies its decision under the broad rubric of fairness and equality, but there may not have been, in the final analysis, anything unfair or unequal in defendant's trial. The neutral reasons for striking the openly gay jurors may well have been valid. Reversing the unbiased jury's convictions for a very serious crime under such circumstances--without first determining the motivation and import of what in fact motivated the prosecutor to strike the openly gay jurors--denigrates rather than protects the equality and fairness of our criminal justice system.

While the majority's quest for social perfection in our criminal justice system is, I am sure, well-meaning, its decision in this instance is misguided. Importantly, that decision comes with a significant societal cost; the automatic reversal of a conviction for serious crimes of violence that may, in fact, have been fairly tried and entered untainted by constitutional error.


       HULL       , J.