Filed 5/5/23  P. v. White CA1/5

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>DOUGLASS WHITE,<br><br>          Defendant and Appellant. | A163356<br><br>(Contra Costa County<br>Super. Ct. No. 42009660) |

Douglass White appeals after a jury convicted him of several crimes involving his assaults on his fiancée.  White asserts: (1) the prosecutor's peremptory challenge of an African American prospective juror violated *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*); (2) the prosecutor committed misconduct in her closing argument; and (3) the trial court erroneously admitted and excluded certain evidence.  We affirm.

### BACKGROUND

### A.

White and Jane Doe had been engaged for about two years when, in early 2020, they decided to take "a break."  Doe testified that White moved out of her Antioch apartment at that time.

About six months later, in June 2020, White showed up at Doe's apartment, let himself in (through the unlocked front door),

and said he wanted to talk about their relationship. Doe repeatedly asked him to leave. White refused and became angry. Doe ran out the door to the stairs, yelling " '[l]eave me alone,' " but White caught up to her. White grabbed her (from behind) with two hands around her neck, spun her around, and then choked Doe, while also moving her body left to right. As she gasped for air, she heard someone yelling " '[s]top, stop.' " Eventually White let go.

One of Doe's neighbors corroborated her account. Specifically, the neighbor said she saw a tall, large African American man strangling Doe, who was also being "moved around like a rag doll." After the neighbor yelled, " '[s]top it,' " the man eventually let go and the neighbor called the police.

Doe testified that, as a result of being choked, she had trouble talking. However, when police arrived that night, she said she was fine and declined medical assistance. White was arrested but Doe declined the police officers' offer to help her seek a restraining order.

## B.

About six months later, in January 2021, White phoned Doe and asked her to join him at a candlelight vigil, in Richmond later that night. Doe agreed. They stayed at the vigil about an hour and then left in Doe's rental car. She was driving.

As they drove towards Doe's apartment, White repeatedly asked her if she was romantically involved with anyone. The conversation escalated into a verbal argument. Doe testified that she asked where she could drop White off, but he would not answer. White asked if someone else was staying with her and, when they arrived at the parking lot for Doe's apartment and he got out of the car, White yelled that she was not telling him the truth.

Doe parked the car and, as she started to get out, White snatched the car keys from her and said she would "give him answers." Doe testified that White refused her request to return the keys, grabbed Doe by her hair, dragged her around the car, and pushed her into the passenger seat. Doe, who weighs 135 pounds, felt helpless. White weighs over 200 pounds. White then got into the driver's seat and began driving. Doe said she tried to escape while the car was still moving slowly, but White pulled her back into the car by her hair and her shirt.

Doe called 911. In the recorded call, which was played for the jury, Doe said, "I don't wanna go. Don't make me go, I don't wanna go. Stop. Stop. Stop. Stop, the car. Give me my fucking keys. Give me my keys. Now. Stop the fucking car. Give me my keys." Doe unintentionally hung up when White tried to grab the phone.

Doe testified that the car ride lasted more than an hour, and that, during the ride, White repeatedly questioned her about who she was sleeping with and why she would not tell him the truth. White also pushed her head against the window glass and poked her "strong" twice in her right eye. Doe testified that her eye stung, became bruised, and swelled shut.

Doe made a second call to 911 about 10 minutes after her first call. In the recorded call, Doe repeatedly stated that she wanted to go home and be left alone. White can also be heard repeatedly asking if he was "the only man you been with?" When Doe says "You're bumping in my eye. My eye hurts," White again asks, "[a]m I the only man you with?" Doe also repeatedly told the dispatcher, "He's holding me hostage. [¶] . . . [¶] He's holding me hostage." White can be heard replying, "Then answer that question."

After that call ended, the 911 dispatcher called back. In the recording played for the jury, Doe states: "He kidnapped me. [¶] . . . [¶] No. Leave me alone. [¶] . . . [¶] He won't leave me

3

alone. [¶] . . . [¶] Get away from me. Ow." White then threw her phone out the window.

Doe also testified that White grabbed her around the neck multiple times. On one occasion, just before the police found them, White choked her until she could not breathe. However, she did not report this (or that White pushed her head into the window glass) to the police or to the prosecutor when she was interviewed a week before trial.

## C.

Antioch Police Department officer Jonathan Downie was dispatched to Doe's apartment shortly after her first 911 call. After the third 911 call, Downie received reports of a kidnapping in a rental car. Downie then accessed information from a camera reading license plates near Doe's apartment. He discovered that a car matching the report passed by the camera around the time of Doe's first call to 911. Downie was able to identify the car as a white Nissan, which had been rented by Doe. Downie later learned that the same license plate had been seen, by another camera reading license plates, near a hotel in Pleasant Hill.

About one hour and fifteen minutes after the initial 911 call, Pleasant Hill Police Department officer Tobin Bolter was dispatched to a hotel parking lot in Pleasant Hill—where he found Doe and White inside a white Nissan. Doe was in the front passenger's seat. She was crying and unable to communicate. Her eye was swollen and bruised.

When Downie arrived about half an hour later, Doe was in the back seat of a patrol car. Downie testified that she had a black (right) eye, which was also red and swollen. Downie also said that, as he talked to Doe, she was crying, scared, and it was "hard for her to put information together." The key to Doe's rental car was found in White's pocket.

4

Downie took a recorded statement from Doe that night, part of which was played for the jury. Her statement was inconsistent with her trial testimony in a few ways: she stated that she was "strong-armed" and told to climb from the driver's seat to the passenger seat and also denied having any plan to meet White that night.

## D.

The defense called Doe's next door neighbor, who testified that she saw White frequently coming and going from Doe's apartment, both before and after June 2020. She also testified that "[White] lived there."

One of White's family members testified that she saw White and Doe together at the January 2021 vigil. She observed nothing unusual about their behavior or Doe's eye.

## E.

The jury convicted White of willfully inflicting corporal injury on his fiancée (Pen. Code, § 273.5, subd. (a); count one), [1] carjacking (§ 215, subd. (a); count two), kidnapping (§ 207, subd. (a); count three), witness intimidation by force (§ 136.1, subds. (b), (c)(1); count four), and assault by means likely to cause great bodily injury (§ 245, subd. (a)(4); count six). On the fifth count, White was acquitted of the charged offense—willfully inflicting corporal injury on his fiancée (§ 273.5, subd. (a))—and convicted only of a lesser included battery offense (§ 243, subd. (e)(1)). White was sentenced to an aggregate prison term of four years and eight months.

---

[1] Undesignated statutory references are to the Penal Code.

5

## DISCUSSION

### A.

White maintains the trial court improperly denied his *Batson/Wheeler* motion. We disagree.

### 1.

Both the state and federal constitutions forbid a prosecutor from striking even a single prospective juror on account of race. (*Foster v. Chatman* (2016) 578 U.S. 488, 499; *People v. Baker* (2021) 10 Cal.5th 1044, 1071.)

A trial court must analyze a defendant's *Batson/Wheeler* motion using a three-prong test. First, the defendant must make out a prima facie case with facts sufficient to support an inference of discriminatory purpose. Second, if the defendant succeeds in making such a showing, the burden shifts to the prosecutor to provide a race-neutral reason for the strike. Third, assuming the prosecutor does so, the court evaluates the prosecutor's proffered reasons and determines whether they are legitimate or pretextual. (*People v. Baker, supra*, 10 Cal.5th at p. 1071; accord, *Johnson v. California* (2005) 545 U.S. 162, 168, 170-171.)

The ultimate burden of persuading the court—that the peremptory challenge more likely than not was based on purposeful discrimination—rests with, and never shifts from, the opponent of the strike. (*People v. McDaniel* (2021) 12 Cal.5th 97, 122 (*McDaniel*); *People v. Lenix* (2008) 44 Cal.4th 602, 612-613.)

In 2020, the Legislature passed Assembly Bill Number 3070, which enacted Code of Civil Procedure section 231.7. (Stats. 2020, ch. 318, §§ 1-3.) The statute codifies the *Batson/Wheeler* principle—that peremptory challenges may not be made on the basis of a prospective juror's race. (Code Civ. Proc., § 231.7, subd. (a).) Among other changes, the new statute makes certain reasons for exercising a peremptory challenge—

6

including having a negative experience with law enforcement—presumptively invalid. (*Id.*, § 231.7, subds. (e)-(g), (j).) It also provides that the objecting party no longer has the burden to demonstrate that a peremptory challenge is more likely than not improperly motivated. Instead, the court must sustain the objection if "there is a substantial likelihood that an objectively reasonable person would view race . . . as a factor in the use of the peremptory challenge." (*Id.,* § 231.7, subd. (d)(1).)

However, the new law only applies to trials in which jury selection begins on or after January 1, 2022. (Code Civ. Proc., § 231.7, subd. (i).) Because jury selection in this case occurred in 2021, this statute does not lessen White's burden.

**2.**

Here, jury selection took place over the course of four days. There were three African American prospective jurors (two men and one woman) in the venire—Juror No. 40, Juror No. 28, and Juror No. 55. The prosecutor peremptorily challenged one of the African American prospective jurors (Juror No. 40), and Juror No. 28 served on the jury. Although Juror No. 55 was questioned during voir dire as a potential third or fourth alternate juror, it was later decided that only two alternates were needed.

The court's voir dire of Juror No. 40 indicated he was a medical assistant and had dealt with patients who had been victims of (or witnessed) domestic violence. However, Juror No. 40 assured the court that he would be able to leave his medical knowledge outside the courtroom and that it would not affect his jury service.

In his juror questionnaire, Juror No. 40 indicated both that he held an attitude or opinion about the criminal justice system that would make it difficult to be fair and that he knew someone who had been a victim, witness, or defendant in a criminal case. When asked by the court whether anyone in his family had been

7

a victim of a crime, Juror No. 40 answered "yes" but indicated that he would prefer to discuss it outside the presence of the other prospective jurors. However, he also told the court that there was nothing about the nature of the charges that would make it difficult for him to be fair and impartial.

When asked to explain in chambers, Juror No. 40 said, "About a year ago, my cousin, she had been a victim of domestic violence, and I was kind of there for her for the whole entire year that she was kind of recovering from it. And she had a broken hand and mental instability that she couldn't really get ahold of. She was afraid to go outside. And it's tough to see a loved one like that." On further questioning from the court, Juror No. 40 added that his cousin reported the domestic violence to police (in San Leandro), that someone was arrested, but that he did not believe anyone was prosecuted. Juror No. 40 said that he had no feelings about how his cousin was treated by law enforcement or the criminal justice system and also that he believed the incident would not affect him in this case.

White's defense attorney asked Juror No. 40 if, because of what happened with his cousin, he felt someone making a domestic violence report is probably telling the truth. He responded affirmatively, but later added, "it depends on the evidence" and that all witnesses start at the same line vis-á-vis credibility.

When asked to describe (again in chambers) the reason for his affirmative answer that he had an attitude or opinion about the criminal justice system that would make it difficult for him to be fair, Juror No. 40 said, "I've had family members that have been overcharged. I've had family members that have been assaulted, and I've had family members that have been assaulted by the police as well too." In response to further questioning from the court, Juror No. 40 said that he "believe[d]" the overcharging incident happened in San Francisco and that he would not hold

8

the experience against the prosecutor in this case. Nor would he use it to favor White. Juror No. 40 also indicated that the police assaults would not affect him in this case and that he could be fair and impartial.

The prosecutor asked seven questions of Juror No. 40 to follow up on the police assault point. In response, Juror No. 40 stated that he had not been personally assaulted by police officers but had witnessed it, in Antioch, "more than maybe five years ago." Juror No. 40 said "[n]o," when the prosecutor asked him if he would hold this experience against any police officers testifying in this trial.

When the prosecutor exercised a peremptory challenge to remove Juror No. 40 from the jury, White's counsel made a *Batson/Wheeler* motion, arguing that there was no evidence that Juror No. 40 could not be fair or impartial.

Defense counsel acknowledged that Juror No. 40 said he had seen his family members "overcharged" in San Francisco and that Juror No. 40 had witnessed assaults by the police. However, defense counsel pointed out that there was no allegation of police misconduct or brutality in this case and that Juror No. 40 believed that he could be fair.

Defense counsel also pointed out that it was the defense that should be concerned about Juror No. 40's experience with his cousin—who was a domestic violence victim. Defense counsel also maintained that the prosecutor's reasons for excusing Juror No. 40 (although not yet stated) were improper proxies for his race—because African American men are prosecuted at disproportionate rates and because African Americans tend to live in communities where there is more police violence. Defense counsel also emphasized that both White and Jane Doe are African American.

9

Without making an explicit finding as to whether defense counsel established a prima facie case, the trial court asked the prosecutor if she wished to respond. The prosecutor began by noting that she herself was African American and said that she "believe[d]" one of the People's witnesses (specifically officer Downie) is African American.

The prosecutor continued, "[Juror No. 40] . . . stated a couple of things that were concerning to me. While I will agree that . . . he was very articulate, he spoke in a very professional manner, the fact that he believed a family member was overcharged in San Francisco County was very concerning to me . . . because, based on my knowledge of San Francisco County, . . . I don't believe that a lot of their cases are overcharged. It's a very liberal county. [¶] And here we charge, I think, less liberally. And so I think that . . . if he may have seen the charges in this case, he may . . . have thought that we have overcharged this case. [¶] The fact that he has witnessed assaults by police officers, specifically Antioch police officers, and both of the investigations [in this case] were conducted by Antioch police officers. [¶] . . . [¶] [T]here is nobody else that was on this panel that had any other similar circumstances or experiences. That was just [Juror No. 40] who had said that. And had there been any other people who stated that they had similar experiences, I would have asked to excuse them as well. So that is my race-neutral reason for [excusing Juror No. 40]."

In response, defense counsel observed that the prosecutor did not follow up with additional questions to Juror No. 40 regarding what happened (or when) in the purportedly overcharged San Francisco case and that the prosecutor merely assumed that this occurred "during a particularly liberal regime at the DA office." Defense counsel also insisted that the prosecutor did not ask sufficient questions about the police assaults—that the prosecutor did not inquire if Juror No. 40

10

knew the officers' names or would recognize them. Nor did Juror No. 40 indicate he would hold his experience against the Antioch Police Department.

The trial court denied White's motion, concluding that he had presented a prima facie case of discrimination but that the prosecutor's race-neutral reasons for challenging Juror No. 40 were "credible and persuasive." Thus, we review only the trial court's third-stage ruling. (See *People v. Smith* (2018) 4 Cal.5th 1134, 1147 (*Smith*); *People v. Scott* (2015) 61 Cal.4th 363, 387, fn. 1, 392.)

After the *Batson/Wheeler* motion was denied, the prosecutor notified the court that, although she continued to believe one of the investigating officers was African American, she had been wrong about Downie's race.

### 3.

White contends that, contrary to the trial court's finding, the prosecutor's reliance on Juror No. 40's witnessing of assaults by Antioch police was not a valid race-neutral reason to exercise a peremptory.[2] He insists that similar experiences are so common among African American men that the prosecutor's reason was actually a proxy for race. As the law stands today, we are compelled to disagree.

At the second step, the opponent of a *Batson/Wheeler* motion must provide a " 'clear and reasonably specific' " explanation of their legitimate reasons for exercising the peremptory challenge. (*Batson, supra*, 476 U.S. at p. 98, fn. 20; *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158 (*Gutierrez*).) In evaluating a trial court's finding that a party has offered a race-neutral basis for challenging a particular prospective juror, we

_____

[2] White concedes that the prosecutor's first reason for exercising the peremptory challenge—Juror No. 40's belief that his relative was overcharged—was race-neutral.

11

must consider whether discriminatory intent is *inherent* in the prosecutor's explanation. If it is not, the reason will be deemed neutral. (*Gutierrez,* at p. 1158.)

At the time of jury selection in this case, the governing law was that disproportionate impact on one race or ethnicity is insufficient to show that a particular justification fails the race neutrality requirement. (*Hernandez v. New York* (1991) 500 U.S. 352, 360 [challenge based on bilingual jurors' *expressed hesitation* in accepting official translations was race-neutral even though it might result in disproportionate removal of Latino prospective jurors]; *People v. Avila* (2006) 38 Cal.4th 491, 545 [rejecting argument that prosecutor's challenge was not race-neutral when it was based on prospective juror's *personal experience* that police officers lied, "not on a theoretical perception that [the prospective juror, as] a member of a minority group, might view the police with distrust"]; *People v. Silas* (2021) 68 Cal.App.5th 1057, 1102-1103 [noting that Code of Civil Procedure § 231.7 would soon make certain reasons presumptively invalid but in the interim *Avila's* reasoning is binding].)

The cases on which White relies—to support his assertion that the prosecutor's concern (about Juror No. 40 having witnessed assaults by Antioch police) was not race-neutral—are distinguishable because they involved assumptions (based on stereotype) that a prospective juror would have certain attitudes, rather than because the juror's voir dire responses demonstrated the prospective juror in fact held such an opinion. (See *People v. Douglas* (2018) 22 Cal.App.5th 1162, 1171-1172 [bias relied on by prosecutor was not neutral because it "was a product of the prosecutor's impermissible group assumptions, unsupported by the record and based solely on the two jurors' sexuality"]; *United States v. Bishop* (9th Cir. 1992) 959 F.2d 820, 825 [prosecutor's reasons "amounted to little more than the assumption that one who lives in an area heavily populated by poor black people could

not fairly try a black defendant"], overruled on another ground by *United States v. Nevils* (9th Cir. 2010) 598 F.3d 1158, 1165-1167.)

Here, in contrast, the record does not suggest the prosecutor challenged Juror No. 40 because she made assumptions about his experiences and opinions based on his race. Rather, the record shows that Juror No. 40's responses to the jury questionnaire and voir dire questions indicated he *actually* had negative experiences with police officers—and, more importantly, he had a negative experience with the specific police department (Antioch) involved in investigating this case—and that he responded affirmatively when asked if he held an opinion or attitude about the criminal justice system that would make it difficult to be fair. The prosecutor identified these experiences and opinions as the reason for her challenge.

Under the authority that binds us, the fact that many other African American men may have had similar negative experiences with law enforcement does not invalidate the prosecutor's justification. (See *Hernandez v. New York, supra,* 500 U.S. at p. 360; *People v. Avila, supra,* 38 Cal.4th at p. 545; *People v. Silas, supra,* 68 Cal.App.5th at pp. 1102-1103.)

**4.**

White also argues that the trial court erred when it found the prosecutor's race-neutral reasons credible. He asserts that neither of the prosecutor's concerns are supported by the record. He is wrong.

A finding of discriminatory intent turns largely on the court's evaluation of the prosecutor's credibility. (See *Batson, supra,* 476 U.S. at 98, fn. 21.) Credibility is measured by, among other factors, "the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 339; *Smith, supra,* 4

13

Cal.5th at p. 1147.) "A prosecutor's positing of multiple reasons, some of which, upon examination, prove implausible or unsupported by the facts, can in some circumstances fatally impair the prosecutor's credibility." (*Smith*, at pp. 1157–1158.)

As long as the trial court made a sincere and reasoned attempt to evaluate each stated nondiscriminatory reason as applied to the challenged juror, we generally defer to the trial court's determination that a prosecutor's race-neutral reasons for striking a juror are credible—and review only for substantial evidence. (*Smith, supra,* 4 Cal.5th at p. 1147; *Gutierrez, supra,* 2 Cal.5th at pp. 1158-1159.) "When the prosecutor's stated reasons are both inherently plausible and supported by the record, the trial court need not question the prosecutor or make detailed findings. But when the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." (*People v. Silva* (2001) 25 Cal.4th 345, 386.)

We reject White's assertion that we owe the trial court no deference. The record demonstrates that the trial court expressly found the prosecutor credible after it engaged in a thorough and lengthy evaluation of both of the prosecutor's reasons for challenging Juror No. 40. In evaluating the prosecutor's justifications for the challenge, the court referred to its own voir dire observations and confirmed that it noted the same legitimate concerns as the prosecutor. The court also disagreed with defense counsel's assertion that the prosecutor asked fewer questions of Juror No. 40 than she asked of other jurors. The court noted specifically that it was the prosecutor who asked Juror No. 40 to identify the city (Antioch) where he witnessed police assaults.

The trial court also said, "I do not recall that there was any other juror who had witnessed police violence from [the Antioch

Police Department] or had any adverse experiences with this agency. So this juror was unique in that respect." This reveals that the court was testing whether the prosecutor's justifications applied to other jurors who were not challenged. The trial court made a sincere and reasoned attempt to evaluate the prosecutor's stated reasons for the challenge. (See *McDaniel, supra,* 12 Cal.5th at pp. 122-123.)

**5.**

White insists that the prosecutor's concern about Juror No. 40's negative experience with Antioch police officers is unsupported by the record because Juror No. 40 stated that he could be fair and would not hold his negative experience against the prosecution. The record is not nearly as clear cut as White suggests.

In his juror questionnaire and his initial voir dire statements, Juror No. 40 indicated to the contrary—that he held opinions or attitudes that would make it difficult for him to be fair. Juror No. 40's responses (considered together) may have been equivocal enough to avoid disqualification for cause, but a prosecutor's basis for a peremptory challenge does *not* have to support a challenge for cause. (*People v. Hardy* (2018) 5 Cal.5th 56, 76; *People v. Manibusan* (2013) 58 Cal.4th 40, 83.) On a mixed record like this one, we cannot conclude that the prosecutor's concern was unsupported or that the trial court erred by crediting it. (See *Manibusan,* at p. 79.)

White also maintains that the trial court was required to scrutinize the prosecutor's reasons more closely because the record does not support either (1) the prosecutor's claim that officer Downie was African American or (2) that the prosecutor was correct that Juror No. 40 must have been mistaken about the San Francisco District Attorney's charging policies.

15

First, we agree with the Attorney General that the prosecutor's misstatement about Downie's race was not properly subject to trial court scrutiny. (See *Smith, supra*, 4 Cal.5th at p. 1147 [key question is "whether the trial court properly credited the prosecutor's *reasons for challenging* the prospective jurors"], italics added; *Gutierrez, supra,* 2 Cal.5th at p. 1159 ["[t]o satisfy herself that an explanation is genuine, the presiding judge must make 'a sincere and reasoned attempt' to *evaluate the prosecutor's justification*"], italics added.) Neither Downie's race —nor the prosecutor's race for that matter—were stated as race-neutral *reasons for challenging* Juror No. 40. In referencing these matters, the prosecutor was merely trying to demonstrate that she had little motive to strike Juror No. 40 because of his race.

Second, the fact that Downie was *not* African American was not established until well after the trial court denied White's *Batson/Wheeler* motion. Thus, the trial court had no opportunity to consider the discrepancy. We review the trial court's *Batson/Wheeler* ruling on the record as it stands at the time the ruling is made. (*People v. Lenix, supra*, 44 Cal.4th at p. 624.) If a defendant believes subsequent developments should be considered, a renewed objection is required to permit appellate consideration of these events. (*Ibid*.)

**6.**

We also reject White's argument that the trial court failed to adequately scrutinize the record regarding the prosecutor's first reason for striking Juror No. 40—her concern about the juror's comment that a family member had been overcharged in San Francisco.

White insists that there is no substantial evidence to support the concern because there is nothing in the record to support the prosecutor's belief about charging policies in San Francisco and that "[t]he prosecutor's reason was based on her

16

own mistaken belief that [Juror No. 40] was misinformed." We disagree.

The prosecutor did not say that she was challenging Juror No. 40 *because he was mistaken* about any objective facts regarding the San Francisco District Attorney's charging policies. In fact, the prosecutor stated that she challenged him, in part, because she was concerned "he believed a family member was overcharged in San Francisco County."

The prosecutor did add that she was concerned "because, based on [her] knowledge of San Francisco County, . . . I don't believe that a lot of their cases are overcharged. It's a very liberal county. [¶] And here we charge, I think, less liberally. And so I think that . . . if he may have seen the charges in this case, he may . . . have thought that we have overcharged this case." As we read the record, the prosecutor was not concerned with an objective factual dispute; the prosecutor was concerned about Juror No. 40's *opinion*.

And Juror No. 40 identified his family member's overcharging experience as underlying his opinion or attitude that might make it difficult to be fair. Our Supreme Court has repeatedly made clear that skepticism about the fairness of the criminal justice system is a valid race-neutral reason for challenging a prospective juror. (*Smith, supra*, 4 Cal.5th at p. 1153; *People v. Hamilton* (2009) 45 Cal.4th 863, 899, 901-902.) Thus, it was not particularly relevant who San Francisco's District Attorney was at the time of the purported overcharging.

The trial court did not err in concluding the prosecutor's concern was supported by the record.

**7.**

At the third stage, we also review all the relevant circumstances bearing on discrimination. (*McDaniel, supra,* 12 Cal.5th at p. 122.) These may include the defendant's race, the

jury's ultimate racial composition, the pattern of strikes, the prosecutor's pattern of voir dire questioning, and any comparative juror analysis. (*Ibid*.)

Here, the trial court found the prosecutor's race-neutral reasons credible and that there are no other circumstances that suggest the prosecutor's reasons were pretext for discrimination. The prosecutor did not use a disproportionate number of her peremptory challenges against African Americans. The prosecutor used one of her seven peremptories to challenge an African American juror. Contrary to White's assertion, the prosecutor's voir dire of Juror No. 40 was not striking in any way. The fact that another African American juror (Juror No. 28) went unchallenged by the prosecutor and remained on the panel may also be considered as indicative of a nondiscriminatory intent. (See *People v. Krebs* (2019) 8 Cal.5th 265, 292.)

We conclude that the trial court made a sincere and reasoned effort to evaluate the prosecutor's race-neutral reasons and that substantial evidence supports its denial of the *Batson/Wheeler* motion.

### B.

White also argues that the prosecutor committed misconduct, during closing argument, by urging jurors to place themselves in Doe's position. We disagree.

### 1.

The United States Constitution is violated when a prosecutor's conduct is so egregious that it infects the trial with such unfairness as to make the resulting conviction a denial of due process. (*People v. Flores* (2020) 9 Cal.5th 371, 403.) A prosecutor's lesser misconduct will violate state law " ' "if it involves the use of deceptive or reprehensible methods to persuade the . . . jury." ' " (*Ibid*.)

18

We must decide whether there is a reasonable likelihood, in the context of the whole argument and the court's instructions, that the jury understood the prosecutor's challenged comment in an improper manner. (*People v. Potts* (2019) 6 Cal.5th 1012, 1036-1037 (*Potts*).)

**2.**

In the People's closing argument, the prosecutor discussed the evidence about what occurred in January 2021. In doing so, she stated:

"[Doe is] backing her car into that parking stall as she described to you. She turns the car off, gathers her keys and her belongings. She's starting to get out [of] the car and that's when the defendant came up to her, strong-armed her, grabbed her by her hair, pulled her around to the front of the car and put her in the passenger's seat. [¶] *The best way to assess this evidence is to be in the car with them that night.*" (Italics added.) Defense counsel objected, stating this "[i]nvites the jury to put themselves." The trial court overruled the objection.

**3.**

It is improper for a prosecutor to ask the jury to convict based on passion or prejudice (*People v. Pitts* (1990) 223 Cal.App.3d 606, 694, 696), or to appeal for sympathy to the victim's suffering in determining guilt. (*People v. Jackson* (2009) 45 Cal.4th 662, 691.) However, there is no reasonable likelihood, in the context of the whole argument and the court's instructions, that the jury construed or applied the challenged remark as any such appeal. (*Potts, supra,* 6 Cal.5th at pp. 1036-1037.)

Here, the prosecutor said only: "The best way to assess this evidence is to be in the car with them that night." The prosecutor was asking the jury to focus closely on the evidence, not on the victim's suffering. She proceeded to walk the jury through the

19

evidence "piece by piece . . . to understand what happened in the car that night."

In any event, the trial court instructed the jury (before closing arguments) that "[n]othing that the attorneys say is evidence." (See CALCRIM No. 104.) The trial court also instructed: "You must not let bias, sympathy, prejudice, or public opinion influence your assessment of the evidence or your decision." (See CALCRIM No. 101.)

Considering the instructions and argument as a whole, we agree with the Attorney General that there is no reasonable likelihood the jury understood the prosecutor to be arguing, contrary to the court's instructions, that it could or should convict White out of sympathy for Doe. (See *Potts, supra*, 6 Cal.5th at p. 1037.)

## C.

Next, White insists the trial court erred in admitting inadmissible lay opinion testimony from officer Downie, as well as testimony regarding Downie's medical expertise. We conclude any error was harmless.

The trial court admitted, over defense counsel's relevance and undue prejudice objections, Downie's testimony that he worked as an emergency medical technician (for seven years) before becoming a police officer. The trial court concluded that, although Downie was not being offered as an expert witness, his background and experience were relevant to the accuracy of his injury observations.

Downie later testified that, when he made contact with Doe in the Pleasant Hill parking lot, she had a swollen and black eye. The prosecutor also asked Downie to describe Doe's demeanor when he spoke to her. Downie responded that Doe was "crying, scared" and had a hard time putting information together. Defense counsel objected and moved to strike Downie's

testimony—that Doe was "scared" and that it was "hard for her to put information together"--on the grounds it lacked foundation and was speculation. The trial court overruled the objection.

We need not decide whether the trial court abused its discretion because any error was harmless. Downie's challenged testimony was cumulative, considering that Doe herself testified that, when police officers arrived in the Pleasant Hill parking lot, she was crying because she was scared. Officer Bolter corroborated her account—testifying that, when he arrived (before Downie), Doe was crying and unable to communicate. Bolter also said that her eye was swollen and bruised.

Furthermore, photographs of Doe admitted into evidence show injury to her eye. Both a video recording from Bolter's body camera and a portion of the recorded statement Downie took from Doe were also admitted into evidence. White offers no challenge to any of this evidence.

On this record, the impact of the allegedly improper testimony was negligible and it is not reasonably probable the jury would have reached a more favorable result absent any assumed error. (See *People v. Jones* (2013) 57 Cal.4th 899, 939-940; *People v. Bradley* (2012) 208 Cal.App.4th 64, 84.)

**D.**

White also maintains that the trial court abused its discretion (and violated his federal constitutional right to present a defense) by limiting his cross-examination of Downie regarding his investigation of where White lived. Any error was harmless.

Doe testified that White moved out in early 2020. During cross-examination of Downie, defense counsel asked, "Did you do any investigation into whether Mr. White and [Doe] were living together?" Defense counsel also asked if Downie found any car keys other than the Nissan's in White's pocket at the time of his

arrest. The trial court sustained relevance objections to both questions.

Defense counsel later stated that she asked these questions to impeach Doe's credibility and to assess whether Downie did a thorough investigation. The court explained that it sustained the objections because the questions were not relevant to Doe's credibility or any other material issue.

Even if we assume the trial court abused its discretion, any error was harmless. We consider prejudice under the *People v. Watson* (1956) 46 Cal.2d 818, 836 standard because White fails to persuade us that either of the purported evidentiary errors violated his constitutional rights. (See *People v. Fudge* (1994) 7 Cal.4th 1075, 1102-1103; *Depetris v. Kuykendall* (9th Cir. 2001) 239 F.3d 1057, 1062.)

White presented testimony from Doe's next door neighbor that contradicted Doe's testimony that White no longer lived with her after June 2020. And White's defense counsel impeached Doe in other ways—by highlighting inconsistencies between her trial testimony and her earlier statements to police, and through Doe's admission (on cross-examination) that she fraudulently reported an accident in an attempt to obtain insurance money.

Most importantly, even if we assume that the excluded evidence would show White was living with Doe in January 2021, the probative value of the evidence is limited. It would not directly suggest that Doe's testimony about what happened in the car, in January 2021, was untrue. And the case against White was overwhelming. It was undisputed that White was with Doe on the January 2021 night in question and that Doe was uninjured at the vigil. Doe's testimony regarding what occurred in the car was largely corroborated by her 911 calls, the photograph and video evidence, and officer Bolter's testimony regarding her demeanor and injuries when she was found in Pleasant Hill.

Any assumed evidentiary error (considered alone or in combination) was harmless.

## DISPOSITION

The judgment is affirmed.

_____
BURNS, J.

We concur:


_____
JACKSON, P.J.


_____
SIMONS, J.


A163356