Filed 5/10/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br>v.<br><br>DAVID G. ARIAS,<br><br>     Defendant and Appellant. | A164789<br><br>(Alameda County<br>Super. Ct. No. 19-CR-010020) |

Defendant David Arias was tried for two counts of sexual abuse committed against J. Doe, a child under 14 years old. During the trial, the defense brought a *Batson/Wheeler*[1] motion challenging the prosecutor's exercise of a peremptory strike against a prospective juror who was a Black woman. After the trial court ruled that a prima facie case of discrimination was established, the prosecutor gave three reasons for the strike. The court then denied the motion without any discussion, stating only that it did not "think the challenge was based on racial animus or bias." The jury convicted Arias of both charges, and he was sentenced to 15 years to life in prison.

We conclude that the trial court's cursory denial of the *Batson/Wheeler* motion was improper, because the prosecutor's reasons for the strike do not withstand scrutiny. The first reason was that the juror would "empathize" more with defense experts than with a prosecution expert because her

_____

[1] *Batson v. Kentucky* (1986) 476 U.S. 79; *People v. Wheeler* (1978) 22 Cal.3d 258.

1

educational background was similar to that of the defense experts. The record belies this justification, however, because the prosecution expert's educational background was essentially the same as the defense experts'. The second reason was that the juror had concerns about implicit bias and unfairness in the criminal justice system. Although a recent statute expressly renders such a reason presumptively invalid, the statute does not apply to this case because the jury was selected before its effective date. (Code Civ. Proc., § 231.7, subds. (e), (i).) But even though this reason was facially race-neutral under then-governing law, it was nevertheless troubling, and it did not independently justify the strike under the totality of the circumstances. Finally, the last reason was that the juror was "pretty opinionated" and might therefore be reluctant to deliberate. This concern was unlikely to have actually motivated the strike, however, because it was not applied to other potential jurors. Applying the governing *Batson / Wheeler* framework, we conclude that the record lacks sufficient evidence on which the trial court could have reasonably relied to accept the prosecutor's reasons for striking the juror without further probing and explanation. Because the error was structural, we reverse.[2]

## I.
### FACTUAL AND PROCEDURAL BACKGROUND

Arias began dating Doe's mother and moved in with her, Doe, and Doe's younger brother when Doe was about four years old. The couple eventually had a son together. They did not marry, but Doe called Arias her dad.

---

[2] As a result, we need not address Arias's numerous other claims, including his claim that the trial court erred by denying his two motions under the California Racial Justice Act of 2020 (Stats. 2020, ch. 317, § 1) (RJA) alleging bias against Latinos.

In April 2019, when Doe was 11 years old and in sixth grade, she reported to a school counselor that Arias had sexually abused her. At trial, Doe described various sexual acts occurring during that school year, including an incident in the bathroom when Arias forced her to touch his penis and an incident in her bedroom when Arias licked her vagina while holding her legs. Arias testified in his own defense and flatly denied ever touching Doe sexually.

Arias was originally charged in July 2019, and he was tried in mid-2021. The operative information alleged two felony counts, forcible lewd acts upon a child under 14 years old and aggravated sexual assault (oral copulation) of a child under 14 years old.[3]

Jury selection began in May 2021. During the process, the prosecutor exercised a peremptory challenge against A.W., a Black woman. The trial court found that a prima facie case of discrimination was established, but it accepted the prosecutor's reasons for the challenge without any assessment, and it then denied the motion. The seated jury had one Black member, a woman.

The jury convicted Arias of both charges. In March 2022, the trial court sentenced him to 15 years to life for aggravated sexual assault and imposed and stayed a term of 8 years to life for forcible lewd acts.

II.
DISCUSSION

A.    *The* Batson/Wheeler *Framework*

" ' "Both the federal and state Constitutions prohibit any advocate's use of peremptory challenges to exclude prospective jurors based on race." '

---

[3] The charges were brought under Penal Code sections 288, subdivision (b)(1) (forcible lewd acts), and 269, subdivision (a)(4) (aggravated sexual assault).

[Citation.] ' "Doing so violates both the equal protection clause of the United States Constitution and the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16 of the California Constitution." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 759–760 (*Holmes*).) The " '[e]xclusion of even one prospective juror for reasons impermissible under *Batson* and *Wheeler* constitutes structural error' " and requires reversal. (*People v. Krebs* (2019) 8 Cal.5th 265, 292; *People v. Silva* (2001) 25 Cal.4th 345, 386 (*Silva*).)

A trial court's consideration of a defendant's *Batson/Wheeler* claim proceeds in three steps. " ' "First, the defendant must make a prima facie showing that the prosecution exercised a challenge based on impermissible criteria. Second, if the trial court finds a prima facie case, then the prosecution must offer nondiscriminatory reasons for the challenge. Third, the trial court must determine whether the prosecution's offered justification is credible and whether, in light of all relevant circumstances, the defendant has shown purposeful race discrimination. [Citation.] 'The ultimate burden of persuasion regarding [discriminatory] motivation rests with, and never shifts from, the [defendant].' " ' " (*Holmes*, *supra*, 12 Cal.5th at p. 760.)

Generally, we review a trial court's denial of a *Batson/Wheeler* motion " ' " 'with great restraint,' " ' " considering "only whether substantial evidence supports its conclusions." (*People v. Lenix* (2008) 44 Cal.4th 602, 613 (*Lenix*).) " 'We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.' " (*Id.* at pp. 613–614.) "But when the prosecutor's

4

stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient." (*Silva, supra*, 25 Cal.4th at p. 386.) In that situation, "the court's failure to probe, or to explain, may eliminate the basis for [appellate court] deference." (*People v. Baker* (2021) 10 Cal.5th 1044, 1078.)

Here, the trial court found that the defense made a prima facie showing of discrimination, the prosecutor offered her reasons for striking A.W., and the court accepted those reasons without comment and denied the *Batson/Wheeler* motion. As a result, the issues on appeal are whether the prosecutor's reasons were facially neutral at the second stage of the analysis and whether the court erred by uncritically crediting them at the third stage of the analysis.

B.    *Additional Facts*

A.W. was in her thirties and had a bachelor's degree in business, a master's degree in counseling, and a Ph.D. in "higher education and organizational change." She worked at a major healthcare company where she "design[ed] and execute[d] learning experience[s] for new [and] existing employees." In response to a question on the juror questionnaire asking for the jurors' "feelings about the criminal justice system," she wrote, "It is a system that has its benefits, such as providing a process that facilitates a decision whether or not someone is innocent or guilty of a crime. However, there are improvements that need to be made to ensure that individual[s] are not falsely convicted of a crime that they did not commit[]."

A.W. was questioned on the second day of voir dire. The prosecutor began by asking A.W. whether there was anything from the previous day's questioning "that stood out to [her] as new or different or anything [she]

5

thought might be troubling that stuck in [her] mind." A.W. replied, "Not so much troubling. I think this process is fairly new. One thing that I did hear over and over again was the one[-]person testimony and that being sufficient or not, as well as the Me To[o] movement [that] came up quite a bit. The position that I take is I'm coming in with a fresh, new lens, so I'm coming in with an open mind. I don't have an opinion either way. One thing I will say is that everyone has unconscious bias and I think that's something that I would want to put out there in the beginning. And it's hard to say check your bias at the door especially if you don't know what that is."

The prosecutor acknowledged that A.W. had "a good point" and other jurors had already raised "the idea of maybe having unconscious biases or implicit biases." The prosecutor said, "[W]e are asking you right now, are you biased that you might not know," and specifically asked whether A.W. "[felt] one way or the other[,] whether it has to do with . . . the Me Too movement or other feelings about the system," such that it "would sort of tip [her] one way or the other or might come up, as [she was] hearing evidence, and testimony from kids about abuse."

A.W. responded, "Not that I can say right now," and asked the prosecutor to clarify what she meant when she "talk[ed] about the system." When the prosecutor asked A.W. to explain further, A.W. responded, "So you said is there anything . . . that struck me either way that might tip me in one way or the other. Right now I could say no. I think that as a juror in terms of the system that we have here, it's not based upon what I feel. I will have, if selected, 11 other peers around me to discuss the evidence in an objective way . . . . So I think that because of that, I don't think my opinion solely will totally weigh heavily on the final decision."

The prosecutor then asked whether A.W. was "open to the idea that [she] might change [her] mind as [she was] deliberating with other jurors about the verdict in this case." A.W. said, "That's a wonderful question. I can't say because . . . I've never gone through this before. One thing that I will say is—my understanding is we have to make a decision based upon the evidence . . . [and] argument that's made. And I feel that if I'm selected and I hear evidence that sways me one way or the other, I think for me, just knowing who I am, . . . I'm going to stick to it." The prosecutor asked whether this characteristic "might interfere with [A.W.'s] ability to discuss the case with other jurors as [they were] deliberating." A.W. responded, "Not necessarily because I'm coming in with an open mind. But I will voice . . . my perception of the evidence that I hear."

In addition, the prosecutor addressed A.W.'s opinion "that improvements needed to be made in the criminal justice system," asking whether A.W. had "specific improvements in mind." A.W. responded,

> "Slowly. If you think of Plessy vs. Ferguson[4] and other cases where a ruling was handed down or even when we have a jury case and it would [be] overturn[ed], or the person was exonerated, that right there is an indicator that there is a need for improvement within the justice system, right?
>
> "So I'm not saying we need to do an overhaul, but certainly, if we're thinking about justice and we're thinking about making sure that those who are innocent [aren't] wrongly convicted, and those who are guilty of a crime are rightly convicted, then we have to scrutinize . . . the system and what we do. It shouldn't be . . . like oh, it's working right now so, you know what, let's keep it as it is. It should be evaluated continually. . . . [T]hat's what I was trying to convey in the questionnaire."

---

[4] *Plessy v. Ferguson* (1896) 163 U.S. 537 (*Plessy*), which established the segregationist separate-but-equal doctrine.

7

Arias's trial counsel questioned A.W. more briefly. As relevant here, counsel asked whether A.W. could promise she would not "compromise [her] opinion just to appease other jurors," and A.W. responded, "Oh, absolutely."

After the prosecutor exercised a peremptory challenge against A.W., the defense made a *Batson/Wheeler* motion. Defense counsel believed "the reason that [the prosecutor] kicked [A.W.] ha[d] to do with her race. And the reason I say that is that all of [A.W.'s] answers were answers that were similar to other people's answers in terms of making sure that people don't have an unconscious bias in evaluating things in an objective manner. And her personal experiences as a Black woman informed her answers." Counsel argued that if the prosecutor tried to justify the challenge based on what A.W. said, "those are proxies for race because we need to have people who have had a wide breadth of experience and mak[e] sure that our justice system is fair."

The trial court found that a prima facie case of discrimination was established and asked the prosecutor to state her reasons for excusing A.W. The prosecutor responded,

> "The first thing that I noticed about [A.W.'s] questionnaire was the fact that she possesses a Ph.D. in a soft science from UCLA. She got her Ph.D. in higher education and organizational change. The possession of . . . a doctorate degree, anything higher than a master's has been a concern of mine throughout [the] case. I kicked [another prospective juror] because like [A.W.], he too . . . had a degree in social psychology, a Ph.D.
>
> "Given the testimony from [defense counsel's] anticipated expert witnesses who are Ph.D.'s in soft sciences themselves, I'm concerned with jurors who may have a similar level of education and may empathize with those experts. [¶] I'm also calling an expert who has a Ph.D., but it's in a different area. And it's the higher educational, soft science context that I'm concerned about. Juris doctorate degrees also concern me which is why I kicked

[two other prospective jurors].  I view [A.W.] as like them, in possession of [a] high level of education.  And the fact that . . . in questioning, she raised concerns about implicit bias, subconscious bias, concerns about innocent people in jail, and concerns about false accusations.  Those buzz words coupled with the higher degree in the soft sciences also went into the reason for my kick.

"Other jurors have talked about those concepts as well and I have not had a chance to kick them because, for example, [one prospective juror] was excused for hardship and he, too— although his doctorate degree was in chemistry.  I'm concerned about folks who may be too fixated on those concepts as a result of their higher education.

"Another concern that I had about [A.W.] was the fact that she says she's pretty opinionated.  And when she was questioned by me and [defense counsel], she indicated that when she forms an opinion, she holds it strongly and she didn't see herself changing her mind.  She might not change her mind . . . [s]he told [defense counsel] when she's back there deliberating[.  T]hat contrasted with some of the other answers that the other jurors have given that I haven't kicked."

The prosecutor argued that a prima facie case of discrimination was not established because A.W. was the only Black woman she had excused, whereas defense counsel had already "exercised two peremptories to kick two Black women from this jury."  In conclusion, the prosecutor said, "For all of those reasons, not [defense counsel's] exercise of peremptories, but for the reasons that I stated about my concerns about [A.W.] over education and hyperawareness of potential for false accusations and potential unwillingness to deliberate, was why I kicked her."

The trial court then denied the *Batson/Wheeler* motion, stating, "All right.  Well, I am going to allow the challenge.  I don't think the challenge was based on racial animus or bias."  The court did not otherwise explain its ruling.

9

C.    *The Prosecutor's Reasons for Striking A.W. Were Facially Neutral.*

Arias claims that one of the prosecutor's reasons for excusing A.W.— that she raised "concerns about implicit bias, subconscious bias, concerns about innocent people in jail, and concerns about false accusations"—was not facially "race-neutral" and thus did not pass muster at the second stage of the *Batson/Wheeler* analysis. We disagree with him on this point.

As we have said, once a trial court concludes that the defendant has made a prima facie showing of discrimination, "the burden shifts to the [prosecutor] to give an adequate nondiscriminatory explanation for the challenge[]." (*People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158 (*Gutierrez*).) To satisfy this requirement, "the [prosecutor] must provide 'a "clear and reasonably specific" explanation of [the prosecutor's] "legitimate reasons" for exercising the challenge[].' " (*Ibid.*) " ' "[U]nless a discriminatory intent is inherent in the prosecutor's explanation," ' the reason will be deemed neutral." (*Ibid.*) Whether a given reason is facially neutral is a question of law reviewed de novo. (*People v. Alvarez* (1996) 14 Cal.4th 155, 198, fn. 9.)

Arias claims that the prosecutor's concern about A.W.'s views on bias and false accusations was not facially neutral, because A.W.'s "comments were not abstract concerns about fairness; her explicit reference to *Plessy v. Ferguson* showed she was concerned with the way the legal system specifically discriminates against African[]Americans."[5] We disagree with this interpretation of the record. The record shows that the main concern

---

[5] Even if some of a prosecutor's reasons are facially neutral, that does not excuse reasons that are not facially neutral. (*People v. Silas* (2021) 68 Cal.App.5th 1057, 1101 (*Silas*); *People v. Douglas* (2018) 22 Cal.App.5th 1162, 1164–1165.) Thus, even though Arias challenges only one of the prosecutor's reasons for striking A.W., we still must determine whether that reason is facially valid. (See *Silas*, at p. 1101.)

about bias during voir dire was not with whether Arias would be subjected to bias on account of being Latino, but instead with whether he would be subjected to bias on account of being charged with a sexual crime against a child. When the issue of implicit bias came up several times during voir dire, the discussion focused on whether potential jurors were inclined to believe sexual assault victims and children. The prosecutor's questioning of A.W. about bias was similarly focused. True, A.W. cited both *Plessy* and wrongful accusations and convictions as examples of the need to consistently reevaluate the justice system to ensure its fairness. And of course, *Plessy* involved discrimination against Black people, and unfair prosecutions sometimes result from racism. But A.W.'s concerns were not clearly race-based, since the context in which she raised them involved whether jurors would be biased against Arias because of the nature of the charged crimes.

Even if one of the prosecutor's reasons for the strike had been that A.W. was concerned about discrimination in the legal system against Black people, that reason would pass muster under the law governing this case. Although such a reason is presumptively invalid under current law (Code Civ. Proc., § 231.7, subd. (e)(1)), it satisfies the *Batson/Wheeler* framework's "low bar . . . for whether a prosecutor's explanation passes muster at the second stage." (*Silas, supra,* 68 Cal.App.5th at p. 1102.) As we noted in *Silas*, our state Supreme Court indicated years ago that a prospective juror's " ' "considerable sympathy for Black people on trial" and [belief that] the justice system was unfair to Blacks' " is a race-neutral reason for exercising a peremptory strike. (*Ibid.*, quoting *People v. Hamilton* (2009) 45 Cal.4th 863, 899; see *People v. Winbush* (2017) 2 Cal.5th 402, 439 ["[s]kepticism about the fairness of the criminal justice system to . . . racial minorities" is a "valid race-neutral ground" for a peremptory challenge].) In doing so, the Court

11

distinguished between an impermissible "challenge based solely on the prospective juror's race" and a permissible "challenge 'which may find its roots in part [in] the juror's attitude about the justice system and about society which may be race related.'" (*Hamilton*, at pp. 901–902.)

Arias argues that *Hamilton* is distinguishable because "[i]n that case, there was evidence the juror was not just concerned about racism in the legal system but was actually biased *towards* Black defendants." But the Supreme Court did not rely on any such bias in deciding that the prosecution met its burden at the second stage. Instead, the Court determined that "the trial court reasonably could conclude" that the prosecutor's reason for the strike "was race neutral." (*People v. Hamilton, supra*, 45 Cal.4th at pp. 901–902.) If the *Hamilton* juror's sympathy toward Black defendants and belief the justice system was unfair to them is a race-neutral reason, we cannot see how the prosecutor's reasons for striking A.W. were not.

Arias also contends that in *Silas*, we concluded that "a juror's belief that 'Black defendants tend to be sentenced more harshly' is 'an explicitly race-tied view,' and does not constitute a race-neutral reason for striking a prospective juror." (Quoting *Silas, supra*, 68 Cal.App.5th at p. 1099.) We made the quoted statement when addressing a trial court's *first-stage* ruling that the defendants failed to establish a prima facie case of discrimination, and we determined that the belief that Black defendants are sentenced more harshly was not a "'nondiscriminatory reason[] . . . that necessarily dispel[led] any inference of bias.'" (*Id.* at p. 1096, quoting *People v. Scott* (2015) 61 Cal.4th 363, 384.) We were careful to point out that even if reasons for exercising a peremptory challenge are not "'facially discriminatory' such that they 'almost certainly raise an inference of discrimination'" at *Batson/Wheeler*'s second stage, they can still be "sufficiently race related to

12

'bolster' an inference of discriminatory intent" at the first stage. (*Silas*, at p. 1097, quoting *Scott*, at pp. 392, 390.) *Silas* does not support Arias's claim that the prosecutor's reasons for striking A.W. were facially invalid.

> D. *The Record Does Not Support the Trial Court's Unexplained Third-stage Ruling that the Peremptory Challenge of A.W. Was Not Discriminatory.*

Having concluded that the prosecutor's reasons for excusing A.W. were facially race-neutral, we turn to the next step of the *Batson/Wheeler* framework. "At step three, courts look to all relevant circumstances bearing on the issue of discrimination." (*People v. McDaniel* (2021) 12 Cal.5th 97, 122; *Foster v. Chatman* (2016) 578 U.S. 488, 501.) These "may include the race of the defendant, the ultimate racial composition of the jury, the pattern of strikes, and the extent or pattern of questioning by the prosecutor during voir dire." (*McDaniel*, at p. 122.) "The ultimate inquiry is whether the State was 'motivated in substantial part by discriminatory intent.' " (*Flowers v. Mississippi* (2019) 588 U.S. __, 139 S.Ct. 2228, 2244.)

The primary focus of the analysis is "the persuasiveness of the prosecutor's justification for [the] peremptory strike. At this stage, 'implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.' [Citation.] In that instance the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible. Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy." (*Miller-El v. Cockrell* (2003) 537 U.S. 322, 338–339.)

Where, as here, a prosecutor gives several reasons for a strike, the apparent validity of one or more of them does not end the analysis. Such an

13

approach by a prosecutor "carries a significant danger:  that the trial court will take a shortcut in its determination of the prosecutor's credibility, picking one plausible item from the list and summarily accepting it without considering whether the prosecutor's explanation as a whole, including offered reasons that are implausible or unsupported by the prospective juror's questionnaire and voir dire, indicates a pretextual justification.  A prosecutor's positing of multiple reasons, some of which, upon examination, prove implausible or unsupported by the facts, can in some circumstances fatally impair the prosecutor's credibility.  [Citation.]  In assessing credibility at the third stage . . . , trial courts should attempt to evaluate the [prosecutor's] statement of reasons as a whole rather than focus exclusively on one or two of the reasons offered." (*People v. Smith* (2018) 4 Cal.5th 1134, 1157–1158.)

As we have said, when a trial court fails to make a sincere and reasoned effort to evaluate the prosecutor's reasons for a peremptory strike, we need not defer to the court's finding that the reasons were genuine.  Here, the prosecutor's three stated reasons for striking A.W. were unsupported, dubious, or unpersuasive.  The record therefore fails to support the trial court's denial of the *Batson/Wheeler* motion.

### 1.     The higher-education reason

We agree with Arias that the prosecutor's first reason is not supported by the record.  The prosecutor justified her desire to avoid jurors with Ph.D.'s in so-called "soft sciences" on the basis that the defense's "anticipated expert witnesses . . . [had] Ph.D.'s in soft sciences themselves," and she was "concerned with jurors who may have a similar level of education and may empathize with those experts."  Although the prosecutor recognized that she was "also calling an expert who ha[d] a Ph.D.," she claimed that her expert's

14

Ph.D. was "in a different area." As best we can tell from the record, this claim was untrue.

The record shows that at the time of voir dire, three experts with higher degrees in "soft sciences" had been disclosed as potential witnesses, two for the defense and one for the prosecution. All three eventually testified. The first defense expert, Dr. Bradley McAuliff, had a Ph.D. in psychology and was employed as a psychology professor. He was qualified as an expert in children's suggestibility and forensic interviewing. The second defense expert, Dr. Alex Schmidt, had a Psy.D. in clinical psychology and was employed as a forensic psychologist. She testified as an expert in the characteristics, treatment, and risk evaluation of sex offenders. Finally, the prosecution expert, Dr. Anthony Urquiza, had "a doctorate in clinical psychology" and was employed as a professor and the director of a child-abuse treatment center.[6] He was qualified as an expert on child sexual assault and child sexual abuse accommodation syndrome.

All three experts had doctoral degrees in psychology. Dr. Urquiza and Dr. Schmidt both specialized in clinical psychology, and Dr. Urquiza, like Dr. McAuliff, conducted research in his role as a professor. Especially given that A.W. did not have a degree in psychology herself, we do not see how any finer distinctions between the areas in which each expert practiced or testified suggested A.W. would "empathize" more with the defense experts than with Dr. Urquiza.[7]

---

[6] Although the record does not specify whether Dr. Urquiza holds a Ph.D. or a Psy.D., we take judicial notice of the fact he has a Ph.D., as stated in other published opinions. (*People v. Ranlet* (2016) 1 Cal.App.5th 363, 371; *People v. Ennis* (2010) 190 Cal.App.4th 721, 727; Evid. Code, § 452, subd. (h).)

[7] We note that two seated jurors, a White man and an Asian man, had bachelor's degrees in psychology.

" 'Where the facts in the record are objectively contrary to the prosecutor's statements, serious questions about the legitimacy of a prosecutor's reasons for exercising peremptory challenges are raised.' " (*People v. Arellano* (2016) 245 Cal.App.4th 1139, 1169.) " 'The trial court has a duty to determine the credibility of the prosecutor's proffered explanations' [citation], and it should be suspicious when presented with reasons that are unsupported or otherwise implausible." (*Silva, supra*, 25 Cal.4th at p. 385.) This duty requires a court to "ma[k]e a sincere and reasoned attempt to evaluate each stated reason as applied to each challenged juror." (*Id.* at pp. 385–386.) "Although an isolated mistake or misstatement that the trial court recognizes as such is generally insufficient to demonstrate discriminatory intent," the same is not true when there is "no support for the prosecutor's stated reason[] . . . and the . . . court has failed to probe the issue." (*Id.* at p. 385.) Here, the trial court utterly failed to probe the higher-education reason, which lacks record support and plausibility. As a result, we do not defer to the court's implicit finding that it was genuine. (See *id.* at p. 386.)

Moreover, as Arias observes, the prosecutor did not ask A.W. questions about her Ph.D. or her educational background more generally, much less about whether her education might incline her to favor the defense experts. A prosecutor's failure to question a prospective juror about a reason given for striking that juror "undermines the persuasiveness of the claimed concern." (*Miller-El v. Dretke* (2005) 545 U.S. 231, 250, fn. 8; see *id.* at p. 246; see also *Gutierrez, supra*, 2 Cal.5th at p. 1170.)

The Attorney General does not identify any support in the record for the higher-education reason, merely brushing aside Arias's concerns as "points [at] which the prosecutor may have overstated her case, or may not

16

have been entirely accurate as to the minutia[e]." Rather, he argues that we should simply defer to the trial court's ruling, despite its brevity and *Silva*'s holding that deference is unwarranted in such a circumstance.

In making his argument, the Attorney General relies on *People v. Reynoso* (2003) 31 Cal.4th 903 (*Reynoso*). In that case, one of the prosecutor's reasons for a peremptory strike was that the prospective juror "was a customer service representative" and thus " 'did not have enough educational experience.' " (*Id.* at pp. 923–924.) Relying on *Silva*, the Court of Appeal declined to defer to "the trial court's express determination" that the reason was "sincere and genuine," because it " 'was not supported by the record and lacked any content related to the case being tried.' " (*Reynoso*, at pp. 923–924.) The Supreme Court reversed, explaining that "[i]t was not this court's intention that the holding in *Silva* should be so expansively applied." (*Id.* at pp. 908, 923.) The relevant question was whether the reason was genuine, not "whether, objectively speaking, all customer service representatives lack sufficient 'educational experience' to sit on a jury . . . or even whether, subjectively speaking, [the prospective juror] . . . herself had insufficient 'educational experience' to sit on the jury." (*Id.* at p. 925, italics omitted.) The Court concluded that *Silva* did not apply because the reason, while "of questionable persuasiveness," was "neither contradicted by the record nor inherently implausible." (*Reynoso*, at p. 929.)

*Reynoso* does not alter our view that deference to the trial court's ruling is unwarranted. Unlike in *Reynoso*, the trial court here made no explicit finding that the prosecutor's reasons were sincere and genuine. And, more importantly, the record here affirmatively contradicts, not just fails to support, the prosecutor's statement that the prosecution expert had a Ph.D. in a different area than the defense experts did. In turn, that undermines

17

the prosecutor's claim that A.W. would favor the defense experts because she had a similar educational background to theirs. In short, the Attorney General fails to convince us that "deferential review is appropriate" on the basis that "the prosecutor's stated reasons are both 'inherently plausible and supported by the record.' "

The Attorney General also claims that "[t]he prosecutor's concern with jurors possessing higher education was obviously to keep the jury focusing on the facts rather than delving into irrelevant academic discussions." We agree that this concern was likely behind the prosecutor's statement that A.W.'s views about implicit bias and the criminal justice system, "coupled with the higher degree in the soft sciences[,] also went into the reason for [the] kick." But the prosecutor viewed A.W.'s education as a problem not just because it might render A.W. "too fixated" on these issues but also because it might incline A.W. to favor the defense experts. We will not disregard unsupported aspects of the prosecutor's stated reasons merely because a more limited concern might have passed scrutiny. (See *People v. Jones* (2011) 51 Cal.4th 346, 365 [" 'If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false' "].)

### 2. The implicit-bias reason

We next turn to the prosecutor's second reason for striking A.W., that A.W. expressed concerns about implicit bias and fairness in the criminal justice system. Initially, we are not persuaded by Arias's claim that the prosecutor mischaracterized A.W.'s stance on these issues. Arias argues that the prosecutor inaccurately stated that A.W. "raised" concerns about these issues, because "in fact the prosecutor *invited* these topics of discussion." Arias's objection to the word "raised" is no more than a quibble: The

18

prosecutor was clearly concerned about A.W.'s substantive views, not about whether A.W. brought them up without prompting.

Arias also argues that "[c]ontrary to the prosecutor's characterization, [A.W.] did not express only concern 'about innocent people in jail and . . . false accusations,'" because she also said that the justice system should ensure that guilty people "'are rightly convicted.'" But the prosecutor never said that A.W.'s "only" concerns were false accusations and wrongful convictions. Nor, as Arias claims, did the prosecutor say A.W. was "overly concerned" with these issues. In short, we disagree that this reason for striking A.W. lacks record support.

Nonetheless, we are disheartened by the prosecutor's desire to reject jurors who were concerned about implicit bias and fairness in the justice system. In passing the RJA, the Legislature repeated findings "that all persons possess implicit biases [citation], that these biases impact the criminal justice system [citation], and that negative implicit biases tend to disfavor people of color [citation]." (Assem. Bill No. 2542 (2019–2020 Reg. Sess.) § 2, subd. (g).) It observed the "growing awareness that no degree or amount of racial bias is tolerable in a fair and just criminal justice system, that racial bias is often insidious, and that purposeful discrimination is often masked and racial animus disguised." (*Id.*, § 2, subd. (h).) And it found that "[i]mplicit bias, although often unintentional and unconscious, may inject racism and unfairness into proceedings similar to intentional bias." (*Id.*, § 2, subd. (i).)

Jurors should be encouraged to guard against the possibility that their decisions will be affected by bias, implicit or otherwise. "[G]iven that implicit biases generally influence decisionmaking, there is no reason to presume that citizens become immune to the effects of these biases when they serve in the

19

role of jurors." (Kang et al., *Implicit Bias in the Courtroom* (2012) 59 UCLA L.Rev. 1124, 1144.) Thus, not only does recognizing implicit bias "not make a person unfit to serve as a juror" (*People v. Thompson* (2022) 83 Cal.App.5th 69, 127 (conc. opn. of Lie, J.)), it arguably makes a person a *better* juror. Under the governing *Batson/Wheeler* framework, we cannot conclude that the prosecutor's reason for striking A.W.—i.e., A.W.'s concern about implicit bias and fairness—was invalid, lacked record support, or was implausible. But the reason was nonetheless troubling, and the trial court should not have so casually accepted it, without further inquiry or comment, as proof that the prosecutor was not acting out of racial bias.

The Attorney General says little in defense of the implicit-bias justification for the peremptory strike. Unconvincingly, he claims that Arias "did not even argue that the challenge was based on the race of [A.W.]," because being "concerned with racial bias in the system" is not a "protected class." In fact, when making the *Batson/Wheeler* motion, defense counsel explicitly claimed that "the reason that [the prosecutor] kicked [A.W.] has to do with her race." Thus, although counsel compared A.W.'s statements about bias to those of other jurors to illustrate why she thought the strike was discriminatory, she clearly argued that A.W. was improperly struck because she was Black.

Ultimately, we need not determine whether the implicit-bias reason would have justified the strike of A.W. had it been the only reason the prosecutor offered. The higher-education reason was not supported by the record and the third reason, to which we now turn, was similarly unconvincing as an actual motivation for the strike. Thus, the implicit-bias reason fails to dispel the conclusion that the prosecutor's "explanation as a whole" was pretextual. (*People v. Smith*, *supra*, 4 Cal.5th at p. 1157.)

### 3. The strong-opinions reason

Finally, Arias challenges the prosecutor's third reason for striking A.W., her inclination to stick to her opinions. To reiterate, the prosecutor characterized A.W. as "pretty opinionated," because A.W. "indicated that when she forms an opinion, she holds it strongly and she didn't see herself changing her mind. She might not change her mind . . . [s]he told [defense counsel] when she's back there deliberating."

We disagree with Arias that this was "not a fair characterization of [A.W.]'s position." True, A.W. said she was "coming in with an open mind," but she also answered equivocally when the prosecutor questioned her about her ability to deliberate with other jurors. When the prosecutor asked whether A.W. was "open to the idea that [she] might change her mind as [she was] deliberating," A.W. responded that she "[*could not*] *say*" and was inclined to "stick to" her decision. (Italics added.) And when the prosecutor asked whether "that might interfere with [A.W.'s] ability to discuss the case with other jurors," A.W. responded, "*Not necessarily* because I'm coming in with an open mind." (Italics added.) As for defense counsel's questioning, A.W. stated that she could "absolutely" promise counsel that she would not "compromise [her] opinion just to appease other jurors." Taken as a whole, these responses adequately supported the prosecutor's observations about A.W.'s reluctance to change her mind.

Arias also argues that other jurors whom the prosecutor did not strike gave responses similar to A.W.'s about their willingness to deliberate. We may perform a comparative juror analysis for the first time on appeal, but such review "is necessarily circumscribed. [We] need not consider responses by stricken panelists or seated jurors other than those identified by the defendant in the claim of disparate treatment." (*Lenix, supra*, 44 Cal.4th at

21

p. 624.)  Thus, we will not consider Arias's claim as to a prospective juror who was not ultimately seated.

We will, however, consider the claim as to two jurors who were seated: Juror No. 10, the only Black member of the jury, and Juror No. 11, who identified as Asian Indian.[8]  Although Arias claims otherwise, both jurors were questioned before the trial court ruled on the *Batson/Wheeler* motion.  Thus, there is no issue as to whether Arias forfeited his reliance on these jurors' responses.  (See *People v. Chism* (2014) 58 Cal.4th 1266, 1319.)

Both jurors responded to defense counsel's questions about how they would feel if the jury did not reach a unanimous verdict and whether they would compromise their opinions to appease other jurors.  First, Arias points out that Juror No. 10 said, "If I don't agree, I still stick to what I do believe, you know, in my heart I believe that my decision is."  She also said that she would "be okay" if the jury did not reach a unanimous decision.  Juror No. 10 also disclosed, however, that a few years earlier she sat on a jury that was able to reach a verdict in a criminal case.  This fact could have reasonably allayed any concern the prosecutor might otherwise have had about Juror No. 10's willingness to deliberate.[9]

Second, Arias points out that Juror No. 11 "said [he] would not compromise [his] opinion just to come to a decision."  But this juror also

---

[8] Our review has been hampered by the fact the record lacks an adequate system for referring to jurors and prospective jurors, whether by number or otherwise.  The numbers we assign these two jurors reflect the order in which the seated juror questionnaires appear in the augmented clerk's transcript.

[9] Since the parties were apparently unaware that Juror No. 10 was Black, neither has addressed whether or how that fact impacts her use in a comparative juror analysis here.  We need not address this issue because we conclude that Juror No. 10 was not sufficiently comparable to A.W.

stated that he thought it would be "a waste of time" if the jury hung, and even though he "might have [his] own opinions and judgments," he would listen to others in the group before reaching "a formed opinion." Thus, Juror No. 11 arguably displayed more openness to deliberating and willingness to compromise than did A.W.

Although we are not persuaded by Arias's attempts to undermine the prosecutor's final reason for striking A.W., the record demonstrates that the reason could not have been a central one for the strike. Not only was it the last reason given, but the prosecutor questioned very few prospective jurors about their willingness to deliberate. Most such questioning was done by defense counsel, who asked only some jurors about the issue. Thus, the record suggests that the prosecutor was not motivated to identify and remove jurors who might be reluctant to deliberate.

> 4. On this record, the denial of the *Batson/Wheeler* motion was erroneous.

"Though we exercise great restraint in reviewing a prosecutor's explanations and typically afford deference to a trial court's *Batson/Wheeler* rulings, we can only perform a meaningful review when the record contains evidence of solid value." (*Gutierrez*, *supra*, 2 Cal.5th at p. 1172.) Both attorneys and courts "have a role to play in building a record worthy of deference," but here, neither the prosecutor nor the trial court fulfilled their obligation to do so. (*Id.* at p. 1171.) The prosecutor's reasons for striking A.W. were all problematic. The first reason was unsupported by the record, the second reason was deeply troubling, and the third reason was of

apparently minor actual significance to the prosecutor. Still, the court accepted these reasons without any explanation or further probing.[10]

The ultimate question at the third stage of a *Batson/Wheeler* analysis is whether the defendant proved purposeful racial discrimination by a preponderance of the evidence. (*Purkett v. Elem* (1995) 514 U.S. 765, 767; *Silas*, *supra*, 68 Cal.App.5th at p. 1094; *People v. Hutchins* (2007) 147 Cal.App.4th 992, 997–998.) Here, none of the prosecutor's reasons for striking A.W. stand up to scrutiny, and the trial court failed to make " 'a sincere and reasoned effort' " to evaluate them. (*Lenix*, *supra*, 44 Cal.4th at p. 614.) Thus, the court's ruling that Arias did not meet his "burden of proving intentional discrimination with respect to the prosecutor's exclusion of [A.W.] . . . was unreasonable in light of the record of voir dire proceedings." (*Gutierrez*, *supra*, 2 Cal.5th at p. 1172.) Reversal is required.

III.
DISPOSITION

The judgment is reversed.

---

[10] For the first time at oral argument, the Attorney General contended that we should remand the case for the trial court to make a better record, three years after the fact, of why it accepted the prosecutor's reasons. We decline to do so. Not only is there no authority for such a procedure, the trial judge has since retired.

_____

Humes, P.J.


WE CONCUR:




_____

Banke, J.




_____

Castro, J.*




\*Judge of the Superior Court of the County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


*People v. Arias*  A164789

Trial Court:
Superior Court of Alameda

Trial Judge:
Hon. Allan Hymer

Counsel:

Law Office of Matthew Siroka, Matthew A. Siroka, under appointment by the Court of Appeal, for Defendant and Appellant.

LatinoJustice PRLDEF, Lourdes Rosado, President and General Counsel, as Amicus Curiae on behalf of Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Catherine A. Rivlin, Supervising Deputy Attorney General, Gregg E. Zywicke, Deputy Attorney General for Plaintiff and Respondent.

*People v. Arias*  A164789